**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
UNITED STATES OF AMERICA, ex rel.
JOSEPH AMICO

FILED UNDER SEAL

                Plaintiff/Relator,

      against

_____ CIV _____

CREDIT SUISSE GROUP AG; CREDIT SUISSE AG;
CREDIT SUISSE HOLDINGS (USA), INC.; CREDIT
SUISSE FIRST BOSTON MORTGAGE SECURITIES
CORP.; CREDIT SUISSE FIRST BOSTON
MORTGAGE ACCEPTANCE CORP.; ASSET
BACKED SECURITIES CORPORATION; DLJ
MORTGAGE CAPITAL, INC.; CREDIT SUISSE
FINANCIAL CORPORATION; CREDIT SUISSE
SECURITIES (USA) LLC; CREDIT SUISSE FIRST
BOSTON FINANCIAL CORPORATION; SELECT
PORTFOLIO SERVICING, INC.

**COMPLAINT**

JURY TRIAL DEMANDED

                Defendants.
-------------------------------------------------------------------x

## TABLE OF CONTENTS

I.     **NATURE OF ACTION** .................................................................................... 1

   A.   Relator's Information ............................................................................ 4

II.    **PARTIES** ...................................................................................................... 9

   A.   The Plaintiff ......................................................................................... 9

   B.   The Relator .......................................................................................... 9

   C.   The Defendants ................................................................................. 10

   D.   The Non-Party Originators ............................................................... 11

   E.   The Government Purchasers ............................................................. 12

III.   **JURISDICTION AND VENUE** ............................................................... 13

IV.   **CONDITIONS PRECEDENT** ................................................................. 13

V.    **FACTS COMMON TO ALL COUNTS** .................................................. 14

   A.   MBS Background.............................................................................. 15

   B.   The Credit Suisse RMBS Process .................................................... 16

   C.   The Credit Suisse CDO Process ...................................................... 20

   D.   Relator's Loan-Level Nationwide Review of The Borrowers and Collateral Properties Underlying the CS RMBS Trusts Reveals Fraud ..................................................... 22

   E.   The Borrowers and Collateral Properties........................................ 24

      i.    Gabriella Hale and Neils Bergstrom ................................... 24

      ii.   Chester Engelking ............................................................... 27

      iii.  Recep Terzi ......................................................................... 29

      iv.  Chris Stapleton ................................................................... 32

      v.    Steve Sroka ......................................................................... 34

      vi.  Fabio De Andrade .............................................................. 36

      vii. Floridays Condominium-Hotel Units ................................. 38

      viii. United Homes ..................................................................... 39

   F.   Defendants Failed To Appropriately Transfer Loans To The MBS Trusts ..................... 42

VI.   **DEFENDANTS' USE OF FALSE RECORDS AND/OR STATEMENTS** ............... 43

   A.   Defendants Misrepresented Material Information With  Respect to the Mortgage Loans That Comprised The MBS ....................................................... 43

      i.    Defendants Falsely Claimed That No CLTV Ratios Were Above 100%.................. 46

   B.   Defendants Affirmatively Misrepresented Proper  Delivery and Assignment of Mortgage Documents ..................................................... 48

   C.   The CDO Credit Ratings Were Materially False ............................ 52

D.   Defendants Failed To Comply with Underwriting Guidelines  Despite Representing to the Contrary in the Offering Documents ........................................................................ 53

E.   Defendants Omitted and Misrepresented Material  Information in the Offering Documents For the CDOs .................................................................................. 58

F.   Defendants Were Closely Involved In  Every Step Of The Securitization Process ......... 61

VII.   **THE U.S. GOVERNMENT FUNDED THE PURCHASE OF MBS AND CDOS AND SUFFERED SUBSTANTIAL LOSSES** ................................................ **62**

A.   Purchases by the U.S. Government ............................................................... 62

B.   Damages to the U.S. Government .................................................................. 63

i.    Impaired Value of MBS .......................................................................... 63

ii.   Impaired Value of CDOs ........................................................................ 66

iii.  Damage to Fannie Mae and Freddie Mac ............................................. 66

iv.   Damages to the Failed Credit Unions, the Failed Banks, the Failed Pension Plans ... 67

v.    Damages to AIG ..................................................................................... 67

VIII.   **CLAIMS FOR RELIEF** ............................................................................ **68**

A.   COUNT ONE ............................................................................................... 68

B.   COUNT TWO .............................................................................................. 70

C.   COUNT THREE .......................................................................................... 71

IX.   **PRAYER FOR RELIEF** ............................................................................ **72**

X.    **DEMAND FOR TRIAL BY JURY** ............................................................ **73**

**ANNEX A** ................................................................................................. **74**

**ANNEX B** ................................................................................................. **80**

**ANNEX C** ................................................................................................. **81**

**ANNEX D** ................................................................................................. **85**

The United States of America, by and through Joseph C. Amico as Relator, brings this action against Defendants CREDIT SUISSE GROUP AG; CREDIT SUISSE AG; CREDIT SUISSE HOLDINGS (USA), INC. ("CS Holdings"); CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. ("MS Corp"); CREDIT SUISSE FIRST BOSTON MORTGAGE ACCEPTANCE CORP. ("MA Corp"); ASSET BACKED SECURITIES CORPORATION ("ABSC"); DLJ MORTGAGE CAPITAL, INC. ("DLJ"); CREDIT SUISSE FINANCIAL CORPORATION ("CS Financial"); CREDIT SUISSE SECURITIES (USA) LLC ("CS Securities"); SELECT PORTFOLIO SERVICING, INC. ("SPS") (collectively or individually, "CS" or "Defendants") alleging as follows:

## I.  NATURE OF ACTION

1.      This is an action under the False Claims Act ("FCA") by the United States of America, as related by Joseph C. Amico, to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.*[1] arising from Defendants' creation and sale of certain residential mortgage-backed securities ("RMBS," or generally, "MBS") and collateralized debt obligations ("CDOs") and the purchase of those securities using funds provided, insured, guaranteed or otherwise made available by the United States Government ("US Government").  The MBS covered by this Complaint are set forth on <u>Annex A</u> (Annex A is deemed to include all other MBS for which Defendants served as underwriter/placement agent, but which are not listed on Annex A).  The CDOs covered by this Complaint are set forth on

---

[1]  This action is brought pursuant to both the FCA as it stood prior to the enactment of the Fraud Enforcement and Recovery Act of 2009 (the "FERA") and the FCA as amended by the FERA.  Defendants' false and fraudulent statements and/or omission were made for the first time prior to 2009, have never been retracted or corrected and endure in form and effect to the present.  This Complaint includes claims relating to the U.S. Government's financing, insuring, and guaranteeing of MBS both before and after 2009.

Annex B (Annex B is deemed to include all other CDOs for which Defendants served as underwriter/placement agent, but which are not listed on Annex B).

2.     Relator's investigation has uncovered that Defendants knowingly made false statements and claims and omitted material information concerning the sale of RMBS and CDOs to the U.S. Government.  Defendants' offering documents and related sales materials purportedly summarized and set forth the quality and condition of the borrowers and properties which backed the RMBS and CDO securities.  This complaint sets forth ample evidence demonstrating the falsity of Defendants' statements regarding the RMBS and CDO securities on a loan-level basis. However, Relator's investigation has revealed that Defendants' fraudulently induced purchasers by including information regarding those borrowers and properties that was knowingly false. Relator knows of no other complaint that advances fact-based allegations that explain precisely why and how Defendants misled the U.S. Government and other purchasers of Credit Suisse RMBS and CDOs with knowingly false statements in the offering documents.

3.     Defendants created and used false records and/or statements in connection with the creation and sale of RMBS and CDOs and presented and/or caused to be presented false or fraudulent claims for payment in connection therewith.  Defendants' false statements and material omissions regarding their RMBS and CDOs have never been retracted and have endured in form and effect to the present.  Thus all financing, guarantees, insurance, and payments associated with Defendants' RMBS and CDOs were made further to and in view of Defendants' false statements.

4.     Relator has found that, in connection with Defendants' RMBS and CDOs, Defendants acted with knowledge and/or reckless disregard for the truth in making false

statements and omitting material information from the offering documents.[2]

5.      Contrary to Defendants' public representations, Defendants knew or recklessly disregarded that many of the borrowers responsible for paying back the loans that securitized the CS RMBS were not creditworthy.  Relator's information reveals that many of the properties included as collateral in the CS RMBS were grossly and recklessly overvalued by Defendants. However, Defendants intentionally concealed this information from purchasers by making false claims in the RMBS and CDO offering documents.

6.      Furthermore, Defendants represented that the underlying mortgage loans complied with specified underwriting standards – standards that Defendants fraudulently ignored.

7.      Defendants also made representations and disclosures in the relevant offering documents that significantly overstated the ability of the borrowers to repay the underlying mortgage loans.  Defendants made fraudulent statements regarding the borrowers' income and debt levels.  Relator's loan-level evaluation of the source documents reveals that Defendants fraudulently misrepresented fundamental information necessary for a potential investor to conduct a proper valuation of a mortgage backed security.

8.      In many instances, Defendants failed even to disclose the names of the borrowers and the addresses of the properties securing the mortgage loans, preventing purchasers, including the United States, from conducting their own due diligence on a borrowers' ability to repay their mortgage loans or to conduct due diligence on the value of the property securing such loans. Instead, purchasers could only rely on Defendants' representations.

---

[2]   As used herein, "with reckless disregard" means "knowingly, with deliberate ignorance and/or with reckless disregard."

9.      Contrary to Defendants' representations in the RMBS offering documents, Defendants rarely, if ever, delivered the original note or an assignment in recordable form on a timely basis and, in many cases, the original note or an assignment was never delivered.  Without a valid assignment in recordable form, the Credit Suisse RMBS trusts were unable to foreclose in the event of a default.

10.      Defendants have not only failed to disclose these problems (including, by failing to file updates to any offering documents) but also have actively concealed these problems from purchasers, including the U.S Government.

11.      The U.S. Government relied on the offering documents when purchasing or otherwise acquiring the RMBS and CDOs.  The U.S. Government financed, insured or guaranteed, directly or indirectly, the purchase of Defendants' RMBS and CDOs, including purchases by the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, the FRBNY, PPIFs, the Maiden Lane Entities, the Federal Home Loan Banks, American International Group, Inc. and Fannie Mae and Freddie Mac (each defined in paragraph 42 below).  Each of those Government Purchasers purchased or otherwise acquired billions of dollars of the RMBS and CDOs with funding provided by the U.S. Government, and through direct purchases and guarantees funded by the Federal Reserve System, the central banking system of the United States (the "Federal Reserve") and the U.S. Treasury (the "Treasury").  The U.S. Government has suffered losses as a consequence.

A.      RELATOR'S INFORMATION

12.      Relator independently gathered and reviewed thousands of notes and mortgages backing Defendants' RMBS deals, and thousands of documents relating to the underlying borrowers and the properties securing the mortgage notes backing the RMBS deals.

13.     Relator reviewed thousands of loan tapes, as filed with the SEC, in order to evaluate the veracity of Defendants' offering documents.  Using the information on the loan tapes, Relator accessed records and uncovered myriad false statements included in Defendants' offering documents.

14.     Relator's information revealed that Defendants represented to investors that the loans underlying the MBS complied with underwriting guidelines and standards.  Defendants publicly stated that: (a) the borrowers were well vetted and creditworthy, (b) Defendants conducted due diligence on the loan portfolios included in its MBS trusts, (c) loans purchased from third party sellers met underwriting standards, and (d) collateral properties were all appraised to independent standards.  Many of those repeated statements were false.

15.     Relator's information also reveals that Defendants included multiple loans from the same borrower (and secured by units in the same development) in the MBS trusts without disclosing this material fact to investors.  Defendants' statements were false and misleading because they omitted information regarding the concentration of loans secured by units in the same development.

16.     Relator's information reveals that Defendants falsely represented that certain collateral properties were owner-occupied.  Based on Relators' information, far fewer underlying properties were occupied by their owners than Defendants disclosed and, correspondingly, more were held as second homes or investment properties.

17.     Relator's information revealed that Defendants failed to disclose the names of the borrowers and the addresses of the properties securing the mortgage.  Defendants' obfuscation ensured that investors would not be able to conduct their own due diligence on the mortgage loans and make their own judgments about borrowers' ability to repay their loans and the value

of properties securing such loans.  This obfuscation also made it impossible for investors to determine if the information Defendants provided in the offering documents was accurate.  The correct and complete information was available to the Defendants but Defendants intentionally concealed this information from purchasers.

18.     Relator's information revealed that, as a matter of practice, Defendants never provided MBS investors with borrower names or property addresses.  In fact, Defendants built safeguards into their MBS marketing system to prevent such information from being given to an inquiring investor.  For example, Relator learned that Defendants' MBS salesmen were not given access to the borrower names or property addresses, so even if an MBS investor asked to look at them, the salesman could not provide the information.

19.     Relator's information revealed that the loan tapes also do not identify the specific lenders for a given loan.  Although Defendants made thousands of mortgage loans, only a handful appeared under Defendants' names in the loan tapes.  By looking at tens of thousands of loans, Relator discovered that Defendants attempted to hide their involvement in the underwriting and securitization of thousands of mortgage loans by recording those loans in the county clerk's offices using a nominee (*i.e.*, a "MERS" loans[3]).

20.     Defendants' use of the nominee allowed them to record mortgage loans, yet keep specific information (for example, lenders' names) from showing up in the County Clerk indices.  Of the 70 loans that Defendants made to the ARMT 2007-1 trust, only one could be found by looking for "Credit Suisse" in the indices.

21.     Relator's information reveals that Defendants concealed the names of borrowers and the addresses of collateral properties and tried to record the vast majority of its mortgage

---

[3] "MERS" stands for Mortgage Electronic Registration System.

loans using a nominee.  Omitting borrower names and property addresses from the loan tapes prevented MBS investors from discovering there were undisclosed concentrations of risk in certain borrowers or certain properties.

      a.      Relator's Exhibit E details 37 loans made by Defendants on the Floridays Condo/Hotel in Orlando, Florida.  28 of these loans defaulted.  Five of the loans were sold to ARMT 2007-1, four of which defaulted.  Defendants failed to disclose how this concentrated risk of default in a single overvalued property could materially impact the trust.

      b.      Relator's Exhibit C details hundreds of borrower and property histories underlying the ARMT 2007-1 trust.  At least five loans made by Defendants for properties in the Crescent Place condo conversion in Altamonte Springs, Florida were placed in ARMT 2007-1. All five loans defaulted with an *average* loss per loan of almost 80% of principal.  In the ARMT 2007-1 Offering Documents, Defendants failed to disclose how this concentrated risk of default in a single overvalued property could materially impact the trust.

22.      Defendants' omission of the property addresses concealed from investors that the collateral properties were routinely and grossly overvalued.  Relator's information reveals that dozens of properties were used as collateral for $200,000, $300,000 or $400,000+ loans that were worth far less.  The historic property values compiled by Relator evidence how drastically values were inflated.  After default, the properties detailed herein returned to un-inflated values. The post default values listed were within range of the pre-inflation values (evidencing that Defendants made loans at hyper-inflated values).  Defendants' purported "appraised" values departed radically from historic values.

23.      The combination of omitted information and recording loans via nominee prevented investors from conducting their own contemporaneous due diligence.  Unable to

identify the loans in (or properties securing) a CS MBS, investors could not formulate their own judgments about the ability of borrowers to repay their loans or about the value of the properties securing such loans.

24.     Further to their effort to conceal the names of lenders, borrowers and addresses of the collateral property, Relator's information reveals that Defendants never made timely transfers of loans or mortgages to its MBS trusts. Had Defendants recorded transfers (known as "assignments" in mortgage circles) to its MBS trusts, investors could have determined the composition of loans and collateral in the trust.

25.     Ownership of a note and corresponding mortgage are critical when foreclosure against the property becomes necessary. Defendants' failure to timely transfer the loans and mortgages means that Defendants cannot prove they own the loans and in many cases cannot foreclose and sell the collateral in the given trusts.

26.     Relator's information revealed that Defendants represented for each loan that the original note, the mortgage, and an assignment would be delivered to the respective MBS trust on the closing date. Relator determined that Defendants rarely delivered the original note or an assignment in recordable form on a timely basis and, in many cases, the original note or an assignment was never delivered. Defendants were solely responsible for all failures to deliver the original notes and/or a valid assignment and all failures to assign and deliver the notes and mortgages to the MBS trusts. Without a valid assignment in recordable form, the CS MBS trusts were unable to foreclose in the event of a default.

27.     Despite Defendants' knowledge of the significant and serious problems about the MBS trusts' missing mortgage assignments and the original notes, Defendants failed to disclose these problems (including, by failing to file updates to the Registration Statements) and have

actively concealed these problems from purchasers, including the U.S. Government.  In addition, Defendants breached representations and warranties by failing to report thousands of defective loans it sold to the U.S. Government.

28.     Defendants' failure to properly transfer the loans to Defendants' MBS trusts also jeopardized (and continues to jeopardize) their tax-exempt status.  Under Federal tax law, loans must be transferred to an MBS trust within 90 days of the trust's closing.  Exhibit A lists hundreds of assignments to ARMT 2007-1, almost all occurring much later than 90 days after closing.  In the rare instances in which certain loans were timely transferred to an MBS trust, it was only because the borrowers immediately defaulted on the corresponding loans.  All the late loan transfers to Defendants' MBS trusts carry a potential tax penalty of 100% of the amount of the loan.  If the IRS chose to enforce the tax, virtually all of Defendants' MBS would become worthless overnight.

29.     Relator's information reveals that Defendants consistently and repeatedly sold CDOs and MBS to the Government Purchasers (defined below) by knowingly and/or recklessly making false statements and omitting material information regarding the very loans and corresponding collateral that funded the RMBS securities that were sold.

## II. PARTIES

### A.     THE PLAINTIFF

30.     This action is brought on behalf of the United States of America, its agencies, departments, and entities, including, without limitation, the United States Treasury, the Federal Reserve, and the Government Entities, as set forth and defined below.

### B.     THE RELATOR

31.     Relator Joseph Amico is a citizen of the United States and resides in the State of New York.

C.    THE DEFENDANTS

32.    Defendants include Credit Suisse Holdings (USA), Inc. ("CS Holdings"), a holding company, offering commercial banking services.  The company was formerly known as Credit Suisse First Boston, Inc. and changed its name to Credit Suisse Holdings (USA), Inc. in February 1997.  CS Holdings operates as a subsidiary of Credit Suisse AG and Credit Suisse Group AG.  Each of Defendants Credit Suisse AG and Credit Suisse Group AG is organized in Canton of Zurich, Switzerland with principal executive offices located at Paradeplatz 8, CH 8001 Zurich, Switzerland.  Defendants CS Securities, DLJ, MS Corp, MA Corp and ABSC are wholly owned subsidiaries of CS Holdings, Defendants SPS and CS Financial are affiliates of CS Holdings.

33.    Credit Suisse Securities (USA) LLC ("CS Securities") is organized as a Delaware limited liability company and is registered as a broker-dealer under the Securities Exchange Act of 1934.  CS Securities has its principal place of business at 11 Madison Avenue, New York, New York.  CS Securities is a registered broker-dealer with the SEC, and is a wholly owned subsidiary of CS Holdings.  CS Securities was the underwriter for each MBS and was the initial purchaser, placement agent and the party who structured and arranged the CDOs and was intimately involved in the offerings of such securities.

34.    DLJ Mortgage Capital, Inc. ("DLJ") is a Delaware corporation with its principal executive offices at 11 Madison Avenue, New York, NY.  DLJ was the sponsor and seller for most of the MBS. DLJ is wholly owned by CS Holdings.

35.    Credit Suisse First Boston Mortgage Securities Corp. is a Delaware corporation with its principal executive offices at 11 Madison Avenue, New York, New York.  MS Corp was the depositor for certain of the MBS and is wholly owned by CS Holdings.

10

36.     Credit Suisse First Boston Mortgage Acceptance Corp. ("MA Corp.") is a Delaware corporation with its principal executive offices at 11 Madison Avenue, New York, New York.  MA Corp was the depositor for certain of the MBS and is wholly owned by CS Holdings.

37.     Asset Backed Securities Corporation ("ASBC") is a Delaware corporation with its principal executive offices at 11 Madison Avenue, New York, New York.  ASBC was the depositor for certain of the MBS and is wholly owned by CS Holdings.

38.     Credit Suisse Financial Corporation ("CS Financial") is a Delaware corporation with its principal executive offices at 302 Carnegie Center, 2nd Floor, Princeton, New Jersey. CS Financial originated a substantial number of the mortgage loans which were included in the MBS.  CS Financial was formerly known as Credit Suisse First Boston Financial Corp.  CS Financial is an affiliate of CS Securities, DLJ, MS Corp, MA Corp, ASBC and SPS.

39.     Select Portfolio Servicing, Inc. ("SPS") is a Utah corporation and is an affiliate of CS Financial, CS Securities, DLJ, MS Corp, MA Corp. and ABSC.  SPS is the servicer for many of the mortgage loans underlying the MBS, including substantially all those loans originated by its affiliates DLJ and CS Financial.

40.     As defined above, collectively, these entities are referred to as "CS" or "Defendants."

**D.     THE NON-PARTY ORIGINATORS**

41.     While a substantial number of the mortgage loans underlying the MBS were originated by Defendant CS Financial, some of the loans underlying the MBS were acquired by DLJ for each MBS from non-party mortgage originators.  The originators of some the loans underlying the MBS include: Countrywide Home Loans, Inc. ("Countrywide"), New Century, Wells Fargo Bank, N.A, Suntrust Mortgage Inc. ("SunTrust"), Secured Funding Corporation,

Irwin Union Bank and Trust Company, EquiFirst Corporation and ResMAE Mortgage

Corporation.

### E.   THE GOVERNMENT PURCHASERS

42.    The U.S. Government, through purchases, financings, insurance, and guarantees,

both direct and indirect, funded by the Federal Reserve and by the U.S. Treasury, acquired

Defendants' MBS and CDOs.  The U.S. Government includes the following "Government

Purchasers":

- "NCUA" means, collectively, the National Credit Union Administration Board (the "NCUA Board"), as Liquidating Agent of U.S. Central Federal Credit Union ("U.S Central"), Western Corporate Federal Credit Union ("Western"), Southwest Corporate Federal Credit Union ("Southwest"), Members United Corporate Federal Credit Union ("Members") and Constitution Corporate Federal Credit Union ("Constitution"), and all other credit unions for which the NCUA Board served as liquidating agent between March 4, 2005 and the date hereof (collectively, the "Failed Credit Unions");

- The Failed Credit Unions;

- "FDIC" means, collectively, the Federal Deposit Insurance Corporation, as receiver for the banks for which the FDIC served as receiver between February 14, 2004 and the date hereof (collectively, the "Failed Banks");

- The Failed Banks;

- "PBGC" means, collectively, the Pension Benefit Guaranty Corporation, as trustee for the PBGC trusteed-plans terminated between January 1, 2004 and the date hereof (collectively, the "Failed Pension Plans");

- The Failed Pension Plans;

- "Fannie Mae" means The Federal National Mortgage Association;

- "Freddie Mac" means The Federal Home Loan Mortgage Corporation;

- "FHFA" means the Federal Housing Finance Agency, as conservator of Fannie Mae and Freddie Mac;

- "FRBNY" means the Federal Reserve Bank of New York;

- "Federal Home Loan Banks" means the 12 regional federal home loan banks a part of the Federal Home Loan Bank System;

- "PPIFs" means the public-private investment funds that are provided equity and debt financing by the Treasury as part of the Public-Private Investment Partnership ("PPIP") of 2009;

- "Maiden Lane Entities" means Maiden Lane LLC ("ML LLC"), Maiden Lane II LLC ("ML II LLC") and Maiden Lane III LLC ("ML III LLC"); and
- "AIG" means American International Group, Inc., and its subsidiaries (including AIG Financial Products) and affiliates.

The Failed Credit Unions are listed on <u>Annex C</u> and the Failed Banks are listed on <u>Annex D</u>.

## III. JURISDICTION AND VENUE

43.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, and the FCA, particularly 31 U.S.C. §3732(a), which specifically confers jurisdiction over actions brought pursuant to 31 U.S.C. §3729 and §3730. This Court has personal jurisdiction, as some of the acts proscribed by §3729 as alleged herein occurred in the Eastern District of New York. Furthermore, certain of the Defendants may be found in the District and transaction business in this District as set forth herein.

44.     Venue is proper in this district pursuant to 28 U.S.C. §1391 and 31 U.S.C. §3732(a) because several of the Defendants are located in this District, and some of the acts and transactions alleged herein and proscribed by 31 U.S.C. §3729 occurred in this District. For example, Defendants originated many of the mortgage loans included in the MBS in this District. Defendants are also subject to personal jurisdiction in this District.

## IV. CONDITIONS PRECEDENT

45.     Pursuant to 31 U.S.C. § 3729 et seq., this Complaint is to be filed *in camera* and under seal, and is to remain under seal for a period of at least sixty days and shall not be served on Defendants until the Court so orders. Further, the United States Government may elect to intervene and proceed with the action within the sixty day time frame after it receives both the Complaint and the material evidence submitted to it.

46.     This suit is based on Relator's knowledge. Relator has direct and independent

personal knowledge and is the original source of the information on which the allegations herein are based.  In particular, Relator has independently gathered and reviewed thousands of notes and mortgages backing MBS deals, some of which are described herein, and thousands of documents relating to the underlying borrowers and the property securing the mortgage notes backing the MBS deals.  Relator's information demonstrates that Defendants have made and used false records and statements, and presented a false claim for payment, against the U.S. Government.

47.    Relator has voluntarily provided all of the material information alleged herein to the Federal Government before filing this action based on said information.

48.    Relator has served copy of same upon the United States and has also served the United States with written information setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

49.    Relator has complied with all other conditions precedent to bringing this action.

## V. FACTS COMMON TO ALL COUNTS

50.    Relator incorporates by reference paragraphs 1 through 49 of the Complaint as if fully set forth herein.

51.    Relator collected thousands of notes and mortgages and thousands of documents relating to the borrowers and properties securing the mortgage notes backing the MBS deals. The documents include notes, mortgages or deeds of trust, assignments, satisfactions, lis pendens, notices of trustee's sale, foreclosure judgments, foreclosure deeds, trustee deeds, quitclaim and warranty deeds, foreclosure pleadings, civil, criminal and bankruptcy judgments, and other documents.

1.    Relator conducted a loan-level review of the ARMT 2007-1 trust, which closed

14

on February 28, 2007 and the CSMC 2007-3 trust, which closed on March 1, 2007.[4]  Attached as Exhibit B is a representative sample of information concerning the borrowers and properties that secured the loans that comprised the CSMC 2007-3 trust.

**A.    MBS BACKGROUND**

52.    Defendants originated mortgage loans and also purchased loans from third parties. It then bundled these loans into the MBS it sold to investors.   Because Defendants originated loans that were securitized into the CS RMBS, Defendants had direct, first-hand knowledge and access to material information regarding each borrower and each property underlying each mortgage.

53.    Defendants sold their MBS pursuant to registration statements which purportedly described the MBS's terms (the "Registration Statements"[5]).  Defendants also sold their MBS and their CDOs pursuant to offering circulars, pitchbooks and other oral and written materials prepared and delivered to purchasers (together with the Registration Statements, the "Offering Documents").

54.    Defendants are directly responsible for the omissions and misstatements of material fact contained in the offering documents because they prepared, signed, filed and/or used these documents to market and sell the MBS, and/or directed and controlled such activities and chose the trustee for each MBS trust.

---

[4] The ARMT 2007-1 and CSMC 2007-3 transactions are representative examples of CS MBS transactions.  In this regard, the debtors and the properties securing the loans underlying the ARMT 2007-1 trust and CSMC 2007-3 trust are representative of the debtors and the properties securing the loans held by other MBS trusts both in quality and method of origination.

[5]  The MBS were sold pursuant to registration statements, which included prospectuses and prospectus supplements.  For a specified CS MBS, the associated registration statement (including the prospectus, the related prospective supplement and other documents, including the assignment agreements, master servicing and trust agreement, loan purchase agreements, underwriting agreement and loan tapes filed with the Securities and Exchange Commission) is referred to herein as the "Registration Statement."  For all CS MBS, collectively, the associated registration statements are referred to herein as the "Registration Statements."

55.    MBS securities pay principal and interest much like a regular bond.  Payments of interest and principal for MBS securities flow from payments on mortgage loans owned by the MBS trust.  In short, borrowers' mortgage loan payments are used to pay principal and interest on MBS securities.  The ability of the borrowers to repay their mortgage loans is crucial to a steady cash flow necessary to make payments to MBS investors.

56.    Two primary asset classes back RMBS trusts: the loans and the collateral properties.  The loans are dependent on the ability of the Borrowers to repay them.  The collateral properties secure performance of the loans; if the Borrower doesn't repay his loan, he loses his property.

57.    In event of a default by a borrower, the value of the property collateralizing a borrower's mortgage loan is crucial to an MBS trust recovering its investment in a loan.  In short, a borrower's property guarantees or secures his loan.  If a borrower defaults, the MBS trust forecloses the mortgage (or deed of trust), sells the property and gets its money back (assuming the property is worth more than the loan).

**B.    THE CREDIT SUISSE RMBS PROCESS**

58.    Each of the Defendants had a role in the securitization process and the marketing for most or all of the MBS.  According to the information provided in the Registration Statements, this process included (i) originating mortgage loans (through Defendants CS Financial and DLJ) for the purpose of securitizing them (these entities did not originate mortgage loans as investments), (ii) purchasing mortgage loans from third party originators, (iii) structuring and arranging the securitizations, (iv) selling the mortgage loans to one of the several CS depositors, (v) transferring the mortgage loans to the related MBS trust, (vi) issuing the MBS certificates, (vii) underwriting the public offering of the MBS, and (viii) marketing and selling the MBS to purchasers such as the Failed Credit Unions, the Failed Banks, the Failed Pension

Plans, the Federal Home Loan Banks, and Fannie Mae and Freddie Mac.

59.     Defendant DLJ acted as sponsor and seller for most of the MBS.  As a sponsor and seller, DLJ both originated mortgage loans through CS Financial and acquired mortgage loans from third party originators.  DLJ initiated the securitization of the loans it originated and acquired by transferring the mortgage loans to one of the three Credit Suisse depositors (MS Corp, MA Corp and ABSC) pursuant to an Assignment and Assumption Agreement or similar agreements.  These depositors then transferred such loans to the MBS trust pursuant to a Pooling and Servicing Agreement, Trust Agreement or similar agreement.  According to the Prospectus for ARMT 2006-2, during fiscal year 2005, DLJ and its affiliates securitized approximately $50 billion of residential mortgages.  According to the prospectus for the ARMT 2007-1, from the period beginning January 1, 2006 and ending December 31, 2006, DLJ publicly securitized through MS Corp in excess of approximately $29.4 billion of residential mortgage loans.

60.     In its capacity as sponsor, DLJ determined the structure of the MBS, purchased the mortgage loans to be securitized and provided data to the credit rating agencies to secure investment grade ratings for the MBS.  DLJ selected one of MS Corp, MA Corp or ABSC as the depositor which transferred mortgage loans from DLJ to a MBS trust.  DLJ also selected CS Securities as the underwriter for the MBS securities and SPS as the servicer, special servicer and modification oversight agent for the Loans.  In its role as sponsor, DLJ knew and intended the mortgage loans it purchased would be sold in connection with the securitization process.

61.     DLJ conveyed the respective mortgage loans to the respective CS depositor (MS Corp, MA Corp or ABSC) pursuant to an Assignment and Assumption Agreement or similar agreement.  The depositors then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trustee for the benefit of the certificateholders of the related MBS trusts

17

pursuant to a Pooling and Servicing Agreement (which sometimes took the form of a combination of a series supplement and standard terms) or similar agreements such as a trust agreement.  DLJ and the related CS depositor was also responsible for preparing and filing the Registration Statements pursuant to which the related MBS were offered for sale.

62.     CS Securities was the lead underwriter for all or almost all of the MBS and all of the CDOs.  In that role, it was responsible for underwriting and managing the offer and sale of the MBS and the CDOs.  CS Securities was also obligated to conduct meaningful due diligence to ensure (i) the Registration Statements about the MBS and (ii) the Offering Documents about the CDOs did not contain any material omissions or misstatements, including as to the manner in which the mortgage loans underlying the MBS and the RMBS underlying the CDOs were originated, transferred and underwritten.

63.     Defendant SPS was engaged in the business of servicing residential mortgage loans.  It serviced many of the residential mortgage loans underlying the MBS.

64.     CS Holdings wholly owns, either directly or indirectly, its subsidiaries DLJ, CS Securities, MS Corp, MA Corp, ABSC, SPS and CS Financial or such entities are affiliates thereof.  Unlike typical arms-length securitizations, the MBS involved various CS Holdings subsidiaries and affiliates at virtually each step in the chain.  For a majority of the MBS, the sponsor was DLJ, the depositor was MS Corp, MA Corp or ABSC, and the lead underwriter was CS Securities.  For many of the MBS, SPS was the servicer, special servicer and modification oversight agent, and CS Financial was the originator for a material amount of the mortgage loans.

65.     As the corporate parent of CS Securities, DLJ, MS Corp, MA Corp, ABSC, SPS and CS Financial, CS Holdings had the power to direct and control the actions of these entities

18

relating to the MBS, and in fact exercised such direction and control over the activities of such
entities relating to the origination of the mortgage loans, the issuance and sale of the MBS and
the servicing of the mortgage loans underlying the MBS.

66.     Defendants MS Corp, MA Corp and ABSC (the depositors for the MBS), SPS
(the servicer and special servicer of many of the mortgage loans) and CS Securities (the
underwriter for the MBS) are directly responsible for the omissions and misstatements of
material fact contained in the Registration Statements for the MBS because they prepared,
signed, filed and/or used these documents to market and sell the MBS, and/or directed and
controlled such activities.  Defendant CS Securities (the initial purchaser, placement agent and
party structuring and arranging the CDOs) is directly responsible for the omissions and
misstatements of material fact contained in the Offering Documents for the CDOs because it
prepared and/or used these documents to market and sell the CDOs, and/or directed and
controlled such activities.

67.     Defendants DLJ (the sponsor of most of the MBS) and CS Holdings are also
responsible for the misstatements and omissions of material fact contained in the Registration
Statements (and about CS Holdings, the Offering Documents for the CDOs) by virtue of their
direction and control over Defendants DLJ, CS Securities, MS Corp, MA Corp, ABSC, SPS and
CS Financial.  CS Holdings also directly participated in and exercised dominion and control over
the business operations of Defendants MS Corp, MA Corp, ABSC, SPS, CS Financial, DLJ and
CS Securities.

68.     CS Holdings, through its subsidiaries was deeply involved in the RMBS market.
CS Holdings aggressively originated and securitized large volumes of mortgage loans and
thereby contributed to Defendants' omissions of material facts and to the inclusion of untrue

19

statements of material facts in the Registration and the Offering Documents relating to the RMBS and CDOs.

69.     As the corporate parents of CS Holdings, Credit Suisse AG and Credit Suisse Group AG had the power to direct and control the actions of CS Holdings and its subsidiaries and affiliates relating to the MBS and CDOs, and in fact exercised such direction and control over the activities of such entities relating to the origination of the mortgage loans, the issuance and sale of the MBS and CDOs, and the servicing of the mortgage loans underlying the MBS.

### C.     THE CREDIT SUISSE CDO PROCESS

70.     The CDOs are similar in design to MBS, except the collateral for CDOs are MBS securities (and/or other CDO securities).  As with the MBS, performance of the CDOs is ultimately based on the performance of the mortgage notes and collateral underlying the MBS (or the other CDOs) which a CDO owns.  The CDOs consisted of "mezzanine" CDOs which were backed by the BBB-rated tranches of MBS and "high grade" CDOs which were backed by single-A and double- AA rated securities.[6]  A third type of CDO is a "CDO-Squared" which is a CDO collateralized primarily with securities of other CDOs.

71.     CS Securities had an inventory of unsold CDOs which it tried to sell by creating new CDOs which purchased unsold tranches of its older CDOs.  These CDOs are sometimes called "CDO-squared."  This scheme sent a false signal to buyers of CDOs that the market for CDOs remained healthy when in fact CS Securities' unsellable securities were merely being re-packaged and re-rated.  CS Securities knew the CDOs it was marketing were defective and that their value was impaired from the start.  CS Securities did not disclose in the Offering

---

[6]  Between 2003 and 2006, the lower rated RMBS junior tranches became popular collateral for CDOs because of the higher rates they offered but which direct investors often shunned thus accumulating on the balance sheet of CS Securities or its affiliates.  The higher rates on these BBB rated tranches of the RMBS allowed CDOs collateralized by such assets to themselves offer higher interest rates on the various CDO tranches.

Documents the amount of unsold CDO inventory CS Holdings owned or the effect CS Holdings'

purchases had on the pricing of the CDO securities sold to purchasers.

72.     CS Securities did not disclose to CDO purchasers the low quality of the mortgage

assets underlying the MBS and other RMBS that were underlying the CDOs.   By mid-2005 at

the latest, Defendants had institutional knowledge of the poor quality of the mortgage loans that

Defendants were using to create the MBS.

73.     As the Sponsor, DLJ selected ARMT 2007-1's pool of 4,345 adjustable-rate

mortgage loans with an aggregate principal balance of approximately $1,425,276,048.  DLJ

purchased most of the loans from its affiliate CS Financial, but also originated many of the

mortgage loans itself.  DLJ also purchased some of the loans from Countrywide and from

Suntrust Mortgage Inc.  DLJ then sold the loans to its affiliate MS Corp., as depositor, on or

prior to the closing date pursuant to an Assignment and Assumption Agreement between DLJ

and MS Corp.  Pursuant to a Supplement, dated as of February 1, 2007 to the Standard Terms of

Pooling and Servicing Agreement dated as of February 1, 2007, MS Corp established the ARMT

2007-1 trust.  MS Corp purportedly conveyed the loans to the trustee of ARMT 2007-1 on the

closing date.  The ARMT 2007-1 trust issued approximately $1,406,865,100 of certificates and

delivered them to MS Corp. on the Closing Date.[7]  CS Securities underwrote the certificates and

sold them to purchasers (or held them on its books or the books of CS Holdings).  SPS acted as

servicer, special servicer and modification oversight agent for the loans.  Each CS entity received

compensation for their various roles in the transaction.

---

[7]   The Series Supplement, the Standard Terms, the Assignment and Assumption Agreement, and the loan tape (the "Loan Tape") which listed the loans (by loan number only) included in the trust, was filed with the SEC on March 15, 2007, as part of the Registration Statement for ARMT 2007-1as Exhibits 10.1, 10.2, 10.3 and 10.5 respectively to the 8-K filed on March 15, 2007.  Amended versions of the Series Supplement and Standard Terms were filed as part of the Registration Statement for ARMT 2007-1 as Exhibits 10.1 and 10.2 to the 8-K/A filed on May 2, 2007.

### D.   RELATOR'S LOAN-LEVEL NATIONWIDE REVIEW OF THE BORROWERS AND COLLATERAL PROPERTIES UNDERLYING THE CS RMBS TRUSTS REVEALS FRAUD

74.     Relator has compiled Exhibit C - a wide ranging, nationwide review of both borrowers and collateral properties underlying the CS RMBS trust ARMT 2007-1.  The borrowers and properties summarized in Exhibit C reveal that Defendants concealed that (i) the borrowers responsible for the loans underlying ARMT 2007-1 were unlikely to repay their loans and (ii) the properties collateralizing the debt were overvalued and inadequate.

75.     Exhibit C consists mainly of borrowers who obtained their loans from CS Financial (Borrowers 9-100 are almost all borrowers from CS Financial).

76.     In Exhibit C, Relator reviewed borrowers and collateral properties from more than 30 counties, including counties in or around New York, Boston, Philadelphia, Miami, Orlando, Phoenix, Washington, DC, Chicago and Denver.

77.     Each borrower in Exhibit C is tied to a specific loan number (sometimes more than one) on the loan tape for ARMT 2007-1.  For example Borrower #1 - Lourdes Summers took out loan #408846523, as found on the loan tape for ARMT 2007-1.  For each borrower, the amount of the loan and collateral property are also identified on Exhibit C.  For example, Borrower #1 - Lourdes Summers - took out a $552,000 loan using Unit 2002 of 8715 Surf Dr. in Panama City, Florida as collateral.  For each borrower, the amount ARMT 2007-1 paid for the loan - assumed as the face amount of the loan - is stated as its investment.  The loan originator is also identified (for Lourdes Summers: SunTrust Bank).

78.     A photo of each collateral property is included in Exhibit C.  The photos were obtained from a county assessor's website or Google Maps.  Where historical data on a property was needed, Relator looked up the relevant information on the county appraiser's website.  Where the county's website was inadequate (e.g., did not go back far enough), Relator reviewed

websites such as Trulia, Zillow or Movato.

79.     Where a borrower had a loan history which could be obtained from public records, a table of each of those loans is included in Exhibit C.  The table is derived entirely from mortgage loans taken out by the borrower (or his or her spouse/domestic partner).  For example, see Borrower #3: Jose Lopez) took out 19 loans over 5 years, totaling $2,272,785.  All loan(s) relevant to ARMT 2007-1 are highlighted in Exhibit C.

80.     For Jose Lopez, the loan relevant to ARMT 2007-1 is the 19th loan ($234,400, obtained from CS Financial).  Where a borrower had more than one loan from Defendants, each of the loans from Defendants are highlighted.  The table shows the lender/originator in the "Comments" column and also identifies if the loan was a second mortgage loan.  Where the Relator was able to identify a CS RMBS trust to which a second mortgage loan was sold, the trust is identified in the table.

81.     Every borrower in Exhibit C has a table showing the value history of a collateral property associated with an ARMT 2007-1 loan.  The value history is generally derived from the county assessor's office (or, sometimes, from deeds).  The value history table may be short or long depending on a collateral property's history.  For example, Borrower #3 (Jose Lopez) has only two entries in the collateral value history table: he bought the property for $114,830 in 2001 and sold it in a short sale during 2010 for $117,000, net.  The Comment column in the table describes the grantee of a deed, or originator of a loan, where appropriate.  It also states if an amount shown is net (a net number to ARMT 2007-1 assumes a 5% or 6% real estate commission and closing costs).

82.     Exhibit C shows the impact to ARMT 2007-1 of its investment in a loan to a borrower.  If there is no loss on a loan, it is stated.  If there has been a loss on a loan, it is

calculated as the amount of any foreclosure judgment less the net recovery from sale of a

property.  If there is a short sale (which often occurred in lieu of a foreclosure), then the amount

of loss or gain on a loan is calculated by deducting net sale proceeds from the loan amount.  If a

loan is in default or still in foreclosure, then the table states ARMT 2007-1 has not yet recovered

its investment.  Where there is a second mortgage, the second mortgage investor, when known, is

identified, as well as the impact on it (usually a total loss).

83.     Occasionally, where Relator recovered relevant information about a borrower,

that information is condensed into one or two sentences on Exhibit C.  For example, see

Borrower # 5 (Rogelio Tuazon).  Tuazon purchased eight condo units at once and took out eight

loans, quickly defaulting on all eight.  In certain cases, a parenthetical is added to give depth to a

borrower's circumstances.  For Tuazon, the fact that his brother also bought two condo units at

the same time is noted in parenthetical.

E.     THE BORROWERS AND COLLATERAL PROPERTIES

84.     An enormous amount of information is condensed into Exhibit C.  The purpose is

to give the reader a single format from which to absorb and process the types of loans and

borrowers that comprised ARMT 2007-1.  Each of the stories below demonstrates that

Defendants fraudulently misstated and omitted material information in the Offering Documents

associated with ARMT 2007-1.

i.     GABRIELLA HALE AND NEILS BERGSTROM

85.     Borrower #21 on Exhibit C is a married couple, Gabriella Hale and Neils

Bergstrom, from Miami, FL.  Over the course of two years ending February 2007, Gabriella and

Neils took out 30 loans on over 15 properties.  By the end of 2007, they had defaulted on all the

outstanding loans.  The total of all 30 loans was over $5,000,000.  Six of the 30 loans were made

by Credit Suisse Financial.  The six CS Financial loans were on three condo units in Gabriella's

name, with 1st and 2nd mortgage loans from CS Financial on each unit.  Two of Gabriella's

condos were in Palm Beach County and a third condo was in Doral, FL (greater Miami). The

first mortgage loan on each of the three condos was sold to ARMT 2007-1.  Examining the loan

tape for ARMT 2007-1, the three loans to Gabriella show up as loans #700439537, 700475401 &

700475480.

86.     The first ARMT 2007-1 condo Gabriella purchased was in Palm Beach, FL at a

cost of $220,400.  CS Financial financed the purchase with 1st and 2nd mortgage loans totaling

$209,320, or 95% of the purchase price.  The ARMT 2007-1 loan tape, included in the Offering

Documents, shows that the $209,320 in loans were made during October 2006 at a ***32.46% Debt

to Income ratio*** ("DTI").  In order to meet the 32.46% DTI stated in the Registration Statement,

Gabriella would have needed an income of $67,945.  A little over a month later, Gabriella

bought a second Palm Beach condo at a cost of $163,900. This time, CS Financial mortgage

loans totaling $155,705 (95%) financed the purchase, at a 33.09% Debt to Income ratio.

Pursuant to this reported DTI, Gabriella's income was $51,523.  A few days later, Gabriella

purchased a third condo in Doral at a cost of $265,900.  Once again, CS Financial mortgage

loans totaling $252,605 (95%) financed the purchase, at a 33.08% Debt to Income ratio.

Pursuant to this reported DTI, Gabriella's income was $83,562.  Three loans, two months, three

different incomes.  None of the three incomes came near what was needed to service the

mountain of debt Gabriella & Neils accumulated in a short period of time, which at the time of

their default was about $4,724,618.  In fact, Gabriella & Neils collectively had to earn

$1,559,124 per year in order to meet the approximately 33% DTI that Defendants reported in the

Offering Documents.  Based on Relator's review, the DTI percentages CS Financial advanced in

the loan tapes were entirely fabricated.

87.     In June and August 2006, Gabriella and Neils refinanced several properties, gaining temporary liquidity in order to buy additional properties.  Defendants were all too happy to underwrite the loans.  Using the proceeds of its refinancing, the couple bought six additional condos (including three Defendants financed) for a total cost of about $1,391,000.  However, to buy all those condos the couple only needed down payments totaling less than $60,000 - far less than the amount they took from the refinanced properties.  As long as Gabriella and Neils could keep borrowing more and more money, they could keep piling up properties and debt.  Defendants readily accommodated their need.

88.     The corresponding Prospectus and Offering Documents for ARMT 2007-1 were false and misleading in several respects.  Defendants failed to indicate that Gabriella was grossly over-indebted.  With so many loans, it was highly likely Gabriella would default and ARMT 2007-1 (and other CS RMBS trusts holding other loans to Gabriella) would suffer losses.  This fact was readily apparent to Defendants who underwrote six of the loans and reviewed (or should have reviewed) the couple's 28 other loans – each of which showed up on their credit report and in public records.  Defendants further failed to indicate the narrow concentration of loans in one borrower.  With so many loans to one borrower, ARMT 2007-1 was not diversified and it was highly likely that ARMT 2007-1 would suffer multiple losses following from a single credit event.  Defendants also failed to disclose that the properties Gabriella posted as collateral were over-valued; the $200,000 condo conversions she bought were actually worth between $50,000 and $100,000.  Defendants further failed to indicate that the Debt to Income ratios disclosed in the Offering Documents were clearly wrong.  As detailed above, the loan tape disclosed three different loans to Gabriella in less than 60 days, each with DTI ratios around 33%.  Each reported DTI represented an entirely different income for the borrower in that two month

window.  Obviously, the DTI ratios were fabrications, made up out of whole-cloth in order to be palatable to potential MBS investors.  Defendants' concealment of the borrower's name, property addresses and use of a nominee to record its mortgages prevented anyone attempting to review risk levels from discovering these risks.  Defendants induced investors to purchase ARMT 2007-1 securities by manipulating their credit rating and dissuading potential investors from attempting due diligence by representing that the loan pool was underwritten to high standards and vetted.

ii.  CHESTER ENGELKING

89.     Chester Engelking (Borrower #63 on Exhibit C) is another extreme (but not uncommon) example of the lack of legitimate loan underwriting by Defendants.  Chester borrowed almost $23 million, spread over 140 loans between late 2003 and early 2007.  Chester defaulted on at least 130 of the 140 loans.

90.     Chester's first cycle of loans ran from late 2003 to late 2004.  During that span, he took out 68 loans, defaulting on all outstanding loans from December 2004 to January 2005.  All transactions during Chester's first default cycle were 100% financing/no money down deals, with seller-financed second mortgage loans.  Almost all of those transactions involved a property seller extending Chester credit in the form of a second mortgage in order for Chester to buy a property with no money down.  In fact, most of the property sellers never moved out of their homes.  During Chester's first cycle of defaults, titles of many properties were taken back by the original sellers (or foreclosure documents indicated the seller still resided at a property).  After the first default cycle, Chester was inactive in the real estate market for 2005 before starting the process all over again.

91.     Chester's second default cycle occurred during 2006, totaling over 70 loans.  During the 2006 cycle, Chester expanded the size and scope of his operation.  Again, his goal

during the 2006 cycle seemed to be to complete as many transactions as possible without exposing his own principle by putting money down.  During his 2006 cycle, the amounts were larger, using more and different lenders,.  Again, many of the properties involved a seller staying in the property after selling it to Chester.  Chester defaulted on all outstanding loans during 2007.

92.     CS made eight loans to Chester during 2006, first and second mortgage loans on four different properties.  The first mortgages were sold to CS MBS trusts: CSAB 2006-3 (two first mortgages), CSAB 2006-4 (a first mortgage) and ARMT 2007-1 (a first mortgage). The second mortgage loans were also sold to other CS MBS deals, such as HEMT 2007-1 and HEMT 2006-5.  Chester defaulted on all eight CS loans by June 2007.  The reason for his default seems apparent: Chester had too much debt.  The old banker's rule of thumb (debt should be three times yearly income) implied Chester earned about $7 million per year.  He did not and he defaulted on each of the loans.

93.     Relator applied the investor rule of thumb (an investor's traditional rule of thumb for economic viability requires that a property's monthly gross rent should be 1% of its purchase price) to 680 W. Roadrunner, Chandler, Arizona (financed by ARMT 2007-1 loan #700461970 and HEMT 2007-2 loan #700461987).  Chester purchased this property for $407,000.  Both loan tapes list 680 W. Roadrunner as an investment.  Using the investor rule of thumb, 680 W Roadrunner needed to generate approximately $4,000 per month of gross rental income in order to be a profitable investment.  Based on historical analysis, the property generated a maximum $1,500-1,600 monthly gross rental income.  Debt service alone on the two CS loans financing Chester's purchase came to almost $2,750 per month.  Including taxes, insurance and maintenance (often 8% to 10% of rent), Chester was losing at least $1,000 per month on 680 W Roadrunner.

94.     Defendants omitted to inform potential investors that Chester was grossly over-indebted.  With so many loans, it was highly likely Chester would default and ARMT 2007-1 (and other CS trusts) would suffer losses.  Defendants also concealed that they had dropped underwriting standards so low, that even with Chester's obscene amount of debt (and a history of almost 70 defaults), they were willing to finance Chester again and again.  Defendants also failed to disclose that the properties Chester posted as collateral were over-valued; their true values were demonstrated in each case by their reversion to historically consistent values after foreclosure.  The ARMT 2007-1 loan tape indicates Chester's debt to income ratio was 36% - a clear fabrication (his DTI ratio was actually in the range of 10,000%).  Defendants' concealment of the borrower's name, property addresses and use of a nominee to record its mortgages prevented anyone attempting to review risk levels from discovering the risks.  Defendants induced investors to purchase ARMT 2007-1 securities by fraudulently disclosing material information about the underlying loans and dissuaded investors from attempting due diligence by telling them the loan pool was underwritten to high standards and vetted.

### iii. Recep Terzi

95.     Recep Terzi took out 42 loans totaling $8,465,650, all primarily taken during a four month window from October 2006 to January 2007.  The loans were concentrated among units of condo developments in and around Orlando, Florida.  Almost 40 of the loans were made by a mortgage company called Montgomery Mortgage.

96.     Defendants bought eight of Recep's loans from Montgomery – first and second mortgage loans on four condos.  Defendants sold three of Recep's first mortgage loans to ARMT 2007-1, identified as loans # 500882935, 500878749 and 500882953, totaling over $800,000.  Defendants also sold to its HEMT 2007-2 trust four second mortgage loans with Recep, identified as loans # 500882939, 500882922, 500882955 and 500889840.

97.     Defendants did not disclose to potential purchasers of ARMT 2007-1 and HEMT 2007-2 that Recep was a highly leveraged speculator.  Each of the four properties for which Defendants sold loans to MBS trusts were leveraged at 95%.  The average leverage on Recep's 20 other condos was also 95%.  Recep gambled investors' money that somehow he would profit from all the over-priced, over-leveraged condos.  Recep was a poor gambler: his final loan was taken in September 2007; he was in default on most loans by November 2007.  Each of Recep's loans were foreclosed with deep losses.  The three ARMT 2007-1 loans lost an aggregate $468,925, an average of 57% per loan.  Each of the three HEMT 2007-2 second mortgage loans were complete losses, an aggregate loss of $155,250.  In total, loans on Recep's three ARMT 2007-1 condo units led to aggregate investor losses of $624,175.  The three ARMT 2007-1 condo units were sold after foreclosure in the open market for an average of merely $160,000 per unit.

98.     Recep's three ARMT 2007-1 loans were all made on the same date (October 19, 2006) by the same lender in the same condo development.  The ARMT 2007-1 loan tape shows Recep's DTI ratio was 33.6% for the $260,000 loan; 37.9% for the $284,000 loan and 33.6% for another $284,000 loan.  These are fabrications: Similar ratios for loans of differing amounts and differing ratios for loans of the similar amounts make clear that the reported DTI ratios were fabricated by Defendants.

99.     Recep also had a fourth set of loans which Defendants sold to other of its MBS trusts.  The reported DTI for the fourth loan set was found on the HEMT 2007-2 loan tape.  The fourth loan set carries a DTI of 35.6% for a $308,000 first mortgage and $57,750 second mortgage made on October 31, 2006, less than two weeks after the three ARMT 2007-1 loans (again by the same lender).  The fourth set of loans were larger than the previous sets, yet

implausibly were reported with a lower DTI than one of the ARMT 2007-1 loans.  The reported DTI also did not take into consideration any of Recep's previous loans.  Defendants reported DTI figures that were untethered from actual income and clear fabrications.  Recep's multiple purchases during 2006 and 2007 and the reported DTIs indicate he should have earned nearly $3,000,000.  He did not.

100.    The rental income associated with the properties was also nowhere near the levels needed to sustain them as investment properties.  In fact, the investor rule of thumb suggests that to be profitable an investment property must earn 1% of the purchase price in monthly income.  To be profitable, the $350,000 condo units Recep purchased should have rented for $3,500 per month.  They did not.  Based on historical analysis, the condo units rented for about $1,600 - $1,700 per month.  Recep's rental income was far less than merely his debt service on the unit (to make no mention of property taxes, insurance and maintenance).  Recep did not have adequate other income to make up the difference.  Among the many things wrong with Defendants' disclosures concerning Recep was their failure to indicate Recep was grossly over-indebted.  With so many loans, it was highly likely Recep would default and ARMT 2007-1/HEMT 2007-2 investors would suffer losses.

101.    Defendants also failed to indicate the concentration of loans in one borrower.  With so many loans to one borrower, it was highly likely ARMT 2007-1 would suffer multiple losses from Recep's defaults.  Defendants also failed to disclose that the properties Recep posted as collateral were over-valued: the $350,000 condo units were worth closer to $160,000.  The ARMT 2007-1 loan tape indicates Recep's DTI ratios were fabrications.  Defendants' concealment of the borrower's name, property addresses and use of a nominee to record its mortgages prevented anyone attempting to review risk levels from discovering the risks.

Defendants fraudulently induced investors to purchase ARMT 2007-1 securities by manipulating borrowers' credit ratings and dissuading investors from attempting due diligence by assuring that the loan pool was underwritten to high standards and vetted.

iv. CHRIS STAPLETON

102.    Between mid-2005 and mid-2007, Chris Stapleton, a bar owner from Clearwater, FL, bought 17 separate properties.  To finance his purchases, Chris took out 32 loans totaling $11,970,300.  Relator's information reveals that within one year of his last loan, Chris defaulted on all of the outstanding loans (not counting four properties that Chris flipped).

103.    Defendants made four loans to Chris, secured by two properties.  The two first mortgage loans were sold to ARMT 2007-1 as loans #700500839 & 700471799.  The two second mortgage loans were sold to HEMT 2007-2 as loans #700500840 & #700471787.  One property Chris financed with CS was in Tampa, FL; the other was across the bay in St. Petersburg, FL.  Both properties were listed on the ARMT 2007-1 loan tape as investment properties.

104.    The loan tape showed Chris had a DTI ratio of 37.23% for the Tampa property and a DTI ratio of 34.36% for the St. Petersburg property.  Chris was highly leveraged having purchased approximately $13 million in property with nearly $12 million of loans.  Each of his purchases was 90%+ financed, often 95% financed.

105.    Relator's information reveals that Chris was part of a scheme which inflated the value of the properties so that an apparent 90% financing was actually a 150% financing, with the extra money being divided among the parties to the scheme.  For example, in August 2007, Chris bought a house with a purported price of over $2.3 million. This property was 90% financed ($2.1 million) with loans from Washington Mutual.  Relator uncovered that the property actually sold in arm's length transaction for just $1.4 million.  This meant, in addition to

financing the entire $1.4 million purchase, the conspirators divided up an extra $700,000 cash at closing.  Chris and his partners fraudulently stole several million dollars cash by buying properties that Defendants, through their fraudulent acts, were all too happy to securitize into RMBS.  Chris is serving seven years in federal prison for his part in the fraud.

106.    The reported DTIs from the ARMT 2007-1 loan tape reveal that Defendants were not naive to the shenanigans.  Chris had a reported DTI of 37.23% for the Tampa property and a DTI of 34.36% for the St. Petersburg property.  The Tampa property was ostensibly the less expensive of the two, being appraised at $499,000.  The St. Petersburg property was the more expensive, appraised at $725,000.  Despite the St. Petersburg property being almost 50% more expensive than the Tampa property, Defendants reported a lower DTI on the property.  As interest rates on the two sets of mortgages were virtually identical, a lower DTI on a more expensive property for the same borrower is mathematically impossible and evidences Defendants' fraud.

107.    Relator's review of the property histories reveals that the purchase prices were inflated.  The St. Petersburg property sold for $238,000 in 2001 and $385,000 in 2004, nowhere near Chris' $725,000 purchase price.  When the St. Petersburg property was sold during 2009 because of Chris' default, it drew about $343,000 net - roughly in line with its price history and well shy of Defendants' inflated appraisal.  Because of the overvaluation (and Chris' obvious inability to repay), investors in ARMT 2007-1 and HEMT 2007-2 lost in excess of $350,000 on Chris Stapleton's St. Petersburg property loans alone.

108.    Chris' Tampa property was even more inflated - on a percentage basis - than the St. Petersburg property.  When the Tampa property sold during 2009 because of Chris' default, it drew about $121,000 ($378,000 less than the "appraisal" a few years earlier).  Because of the

property's overvaluation (and Chris' obvious inability to repay), investors in ARMT 2007-1 and HEMT 2007-2 lost in excess of $350,000 on Chris Stapleton's Tampa property loans.

109.    Defendants clearly had not performed any due diligence, underwriting, oversight, or review with respect to the loans CS made to Chris.  Defendants represented in the Offering Documents that they appraised the properties, reviewed Chris' income and bar business, and performed a credit check.  However, Defendants were at least reckless in failing to identify the obvious red flags in Chris' history.

110.    Defendants failed to disclose that Chris was grossly over-indebted.  With so many loans, it was highly likely Chris would default and ARMT 2007-1/HEMT 2007-2 investors would suffer losses.  Defedants also failed to disclose that the properties Chris posted as collateral were over-valued.  The ARMT 2007-1 loan tape indicates that the DTI ratios Defendants reported were fabrications.  Defendants' concealment of the borrower's name, property addresses and its use of a nominee to record its mortgages prevented anyone attempting to review risk levels from discovering the risks.  Defendants induced investors to purchase ARMT 2007-1 securities by manipulating credit ratings and dissuading investors from attempting due diligence by telling them the loan pool was underwritten to high standards and vetted.

v.  STEVE SROKA

111.    The story of Steve Sroka (Borrower #26) is a very common story among the borrowers whose loans comprised ARMT 2007-1.  Steve, the owner of Poppy's Pizza in Fort Myers, appeared to use his personal home as an ATM, routinely increasing his debt, until he eventually defaulted.

112.    Steve originally purchased his modest ranch house at 15561 Omai Ct, Fort Myers, FL during December 2000 for $150,000.  To finance his purchase, Steve took out a $130,000

first mortgage loan.  Looking at the December 2000 purchase of his house and using the banker's rule of thumb (buy no more than 3 times your earnings), a reasonable estimate of Steve's 2000 earnings was $50,000 to $60,000 per year.

113.    During 2004, Steve refinanced his existing $130,000 1st mortgage with a Provident Bank first mortgage loan of $145,000.  During the 4 years Steve owned his house to that point, it appreciated modestly and Steve cashed out $15,000 of equity.  Later in 2004, Steve took out a Riverside Bank $70,500 second mortgage loan, cashing out that amount.  By the end of 2004, Steve was carrying about $215,000 of mortgage debt.  A year later, at the end of 2005, Steve again refinanced his mortgages, this time combining his debts into a Homefield Financial $262,500 first mortgage loan.  Steve cashed-out about $47,000 to $50,000 with this refinancing.

114.    About a year after the Homefield mortgage, Steve refinanced his home yet again, this time with a whopping $334,900 first mortgage loan from CS (#700487813).  The ARMT 2007-1 loan tape indicates that CS appraised Steve's house at $394,000 and readily lent him 85% of that amount.  Steve paid off the Homefield mortgage and cashed out about $72,500 with his CS loan.  All totaled, Steve cashed out about $208,000 over the years from his house, a house he bought just a few years earlier for $150,000, and $20,000 down.

115.    Steve's debt load was more than his small business could carry, and the ARMT 2007-1 loan was in foreclosure by December 2007, merely 10 months after it was made.  The ARMT 2007-1 trust eventually foreclosed and sold the property during 2009 for $155,000, net.  The property's sale price is consistent with its historical value and a fraction of the nearly $400,000 appraisal CS gave it in order to continue to churn out inflated loans to populate its MBS.

116.    Defendants failed to disclose that Steve was over-indebted.  An evaluation at the

time of the loan would have made clear that Steve was likely to default and that ARMT 2007-1 would eventually suffer a loss.  Defendants also failed to disclose that Steve's property was over-valued - the ranch was worth closer to its historical $160,000 price, than the nearly $400,000 value CS underwrote.  Defendants' concealment of the borrower's name, property address and its use of a nominee to record its mortgages prevented anyone attempting to review risk levels from discovering the risks.  Defendants induced investors to purchase ARMT 2007-1 securities by manipulating credit ratings and dissuading investors from attempting due diligence by telling them the loan pool was underwritten to high standards and vetted.

### vi. FABIO DE ANDRADE

117.     Fabio de Andrade (Borrower #32) is an example of a borrower who purchased property with a grossly inflated value - a common occurrence in the ARMT 2007-1 pool.  The price Fabio paid was far above the property's historic value.  There was no chance he would make money, a high likelihood he would default, and a near certainty ARMT 2007-1 investors would lose money on the loan.

118.     CS made a $216,900 first mortgage loan (#70048687) to Fabio on a condo at 107 Freedom Ct, Deerfield Beach, FL.  A picture of the property shows it to be an unremarkable unit in an unremarkable condo.

119.     Fabio purchased the condo unit during December 2006 for $270,000.  To finance his purchase, Fabio took out a $216,000 CS first mortgage loan and a $54,000 CS second mortgage loan, providing him with 100% financing for his purchase.  CS sold Fabio's first mortgage loan to ARMT 2007-1 and his second mortgage loan to HEMT 2007-2.

120.     The value of Fabio's condo unit appears inflated at the time of his purchase.  According to his affidavit of residency, Fabio lived in the unit when he purchased it (*i.e.*, he was a tenant and bought it from the owner).  Prior to Fabio buying the unit from his landlord, it

changed hands four times within a few years.  During 1998, the unit was sold in an apparent

arm's-length transaction for $67,900.  During 2001, the unit sold for $92,200, a 36% increase.

The unit sold again during 2003 for $123,000, a 34% increase in just two years.  The unit sold

again during 2004 for $175,900, a 43% increase in less than 18 months.  During 2006, the unit

was sold to Fabio for $270,000, a whopping 54% increase in less than 2 years.  CS readily

appraised the unit for $270,000 and lent Fabio 100% of the purchase price.

121.    CS's 100% financing to Fabio was poorly underwritten (both for creditworthiness

and collateral value).  Fabio lasted less than nine months before he defaulted.  Fabio's default

was largely a result of the high debt associated with the unit, interest on all the debt was more

than $2,000 per month.  This was more than Fabio could afford, and by October 2008, the CS

first mortgage loan was foreclosed.  ARMT 2007-1 was the only bidder at the foreclosure

auction and eventually sold the unit 3 years later during 2011, netting $82,500 for it. The amount

ARMT 2007-1 netted is consistent with the unit's historical, pre-inflation price (i.e., the unit sold

for $92,200 gross during 2001 and $82,500 net during 2011).  The unit's true value was a

fraction of the $270,000 appraisal CS gave it.

122.    Defendants failed to disclose that Fabio was over-indebted.  It was highly likely

Fabio would default and ARMT 2007-1 would suffer a loss.  Defendants also failed to disclose

that Fabio's unit was over-valued; the unit was worth closer to $90,000 than the $270,000 value

CS gave it.  Defendants' concealment of the borrower's name, property address and its use of a

nominee to record its mortgages prevented anyone attempting to review risk levels from

discovering the risks.  Defendants induced investors to purchase ARMT 2007-1 securities by

manipulating credit ratings and preventing investors from attempting due diligence by

obfuscating the identifying information and assuring the public that the loan pool was

underwritten to high standards and vetted.

vii.      FLORIDAYS CONDOMINIUM-HOTEL UNITS

123.    Exhibit E is a survey of units in a condominium-hotel called the Floridays Resort located in Orlando, Florida. Exhibit E surveys those units of the Floridays Resort financed by CS MBS trusts. Relator identified 37 hotel units sold to individuals who financed through CS, directly or indirectly. Of the 37 CS financed units, 28 defaulted through October 2014. The defaults generally led to losses for the relevant CS MBS trusts.

124.    Of the 37 Floridays units surveyed in Exhibit E, 25 were financed directly by CS Financial. The other 12 units were financed by mortgage companies (IRES and Allied) who sold the loans to CS who, in turn, re-sold the loans to CS MBS trusts. Loans on five Floridays units were sold to ARMT 2007-1 and given loan numbers 700475614; 700395670; 700497735; 500884344 and 700463383. Four of the five ARMT 2007-1 loans defaulted.

125.    The Floridays condo-hotel presents a snapshot of some issues with CS's credit underwriting. Of the loans surveyed on Exhibit E, more than 75% defaulted - an astonishingly poor ratio. The poor credit underwriting was mostly the result of Defendants' behavior, as CS made most of the loans surveyed. The financed units were overvalued, despite being newly built. As a result, the CS MBS trusts routinely lost significant money on first mortgage loans, ostensibly written at 80% of value. With accurately valued properties, such losses would not be routine.

126.    Defendants failed to disclose the loan concentration in one development. It was highly likely many defaults at a single development would cause ARMT 2007-1 to suffer multiple losses. Defendants also failed to disclose that its low/non-existent underwriting standards would result in more than 75% of the Floridays loans defaulting. Defendants also failed to disclose that the Floridays units were over-valued: the units were worth around

$150,000, far less than Defendants' appraised values in excess of $350,000.  Defendants'

concealment of the borrower's name, property address and use of a nominee to record its

mortgages prevented anyone attempting to review risk levels from discovering the risks.

Defendants induced investors to purchase ARMT 2007-1 securities by manipulating credit

ratings and dissuading investors from attempting due diligence by telling them the loan pool was

underwritten to high standards and vetted.

viii.    UNITED HOMES

127.    Exhibit D is a survey of loans made to purchasers from a single developer, United

Homes – based in Queens, New York.  The 110 loans surveyed were selectively sold to various

CS MBS trusts over several years.  Approximately 95 of the 110 United Homes loans defaulted -

an astonishing rate.

128.    Defendants sold the United Homes loans to multiple CS MBS trusts, including at

least 19 loans to ARMT 2007-1.  Relator was able to identify at least 79 total loans that CS

purchased from United Homes affiliates during 2006 alone.

129.    United Homes is a fringe property developer in Queens, New York.  United

Homes' business model consists of buying up odd properties, spending minimally on cosmetic

fix-ups or cheap construction and then selling the properties for an inflated sum, usually to low-

income buyers.  United Homes used its own mortgage affiliates to originate loans from its

property sales.  CS was a frequent customer of United Homes, buying dozens of United Homes-

originated loans during 2006 and 2007 and re-selling those loans to its MBS trusts.

130.    In 2003, several federal lawsuits commenced against United Homes for shoddy

construction, over-pricing, predatory lending and racial discrimination.  The lawsuits were

resolved in 2011with verdicts against United Homes and its principals (the verdicts were upheld

on appeal during January, 2014).  Despite United Homes' legal history, CS appears to have

39

eagerly purchased dozens of mortgage loans originated by its affiliates during 2006.

131.    The low quality of the collateral properties backing the United Homes loans is apparent from evaluating loan #500830318 made to Andrew Ramgeet.  Loan #500830318 was a $535,200 first mortgage loan made during August, 2006, with 1113 McBride Street, Queens New York as collateral (the property pictured on the first page of Exhibit D).  Simultaneous with the first mortgage loan, a $133,800 second mortgage loan was made to Andrew, which enabled him to finance 100% of the $669,000 purchase price.  Andrew's first mortgage loan was purchased by CS and sold to ARMT 2007-1.  Andrew appears to have been a shill, as he transferred the property - subject to the mortgages - to Simone Rochester during April, 2007 for no consideration.  Rochester was a "no consideration" recipient of nine other United Home properties which went into default.  Andrew's first mortgage loan was in foreclosure by the end of 2007, a foreclosure judgment was entered during March 2008 and the property was auctioned during September 2010.  The property sold for only $1,000 at auction (likely discounted due to tax lien).  A subsequent, arm's-length sale valued the property at about $115,000.  ARMT 2007-1 lost all $535,200 of its investment in Andrew Ramgeet's first mortgage.  The 2nd mortgage investor also lost all $133,800 of its investment.

132.    Andrew was not a creditworthy borrower.  From 2004 thru 2006, Andrew took out 15 loans totaling $4,260,800.  Included in this total were first and second mortgage loans on 1113 McBride St (above) and on 1115 McBride St.  Andrew defaulted on all outstanding loans during 2007, including both McBride Street Properties.  Both McBride Street properties were transferred to Simone Rochester during April 2007 for no consideration.

133.    Andrew lived with Tina Huckshold at 3108 Seagirt Ave, Queens - another United Homes property.  Tina Huckshold also had a $535,200 loan in the ARMT 2007-1 pool,

collateralized by 1117 McBride St. Tina transferred 1117 McBride to Simone Rochester for no consideration during April 2007, and defaulted on her loans by late 2007, too.

134.     Andrew Ramgeet exemplifies the poor creditworthiness and low quality, over-valued properties characteristic of United Homes originated loans purchased by CS (and sold to its MBS trusts). As CS was not buying for its own portfolio, it appears due diligence on the United Homes-originated loans was non-existent. This is largely corroborated by the fact that 90% of United Homes-originated loans in CS MBS trusts defaulted. Furthermore, according to the ARMT 2007-1 loan tape, CS represented that 1113 McBride was Andrew's "primary" residence, which it was not. CS also represented that 1117 McBride St was Tina Huckshold's "primary" residence, which it was not. The ARMT 2007-1 loan tape also shows DTI ratios for Andrew and Tina which appear to be fabrications.

135.     Defendants failed to disclose that there was a heavy concentration of loans from one questionable source - United Homes - securitizing ARMT 2007-1. It was highly likely that many defaults from loans originated by United Homes would cause ARMT 2007-1 to suffer multiple losses. Defendants also failed to disclose its recklessly deficient underwriting standards (more than 84% of the United Homes-originated loans defaulted). Defendants also failed to disclose that the United Homes properties were over-valued; a fair estimation is the United Homes properties were worth, on average, about one-third of Defendants' appraised values. Defendants' concealment of the borrower's name, property address and its use of a nominee to record its mortgages prevented anyone attempting to review risk levels from discovering the risks. Defendants induced investors to purchase ARMT 2007-1 securities by manipulating credit ratings and dissuading investors from attempting due diligence by representing that the loan pool was underwritten to high standards and vetted.

## F.   DEFENDANTS FAILED TO APPROPRIATELY TRANSFER LOANS TO THE MBS TRUSTS

136.   Relator reviewed approximately 300 loans out of a total of the 4,345 loans that were included in the mortgage pool for the ARMT 2007-1 securitization in order to determine if Defendants properly transferred the loans in accordance with the terms of the Trust Agreement and the disclosures set forth in the Registration Statement.  Exhibit A includes a sample of assignments of the loans in ARMT 2007-1.

137.   Relator's review shows, of 300 sampled loans, Defendants failed to timely assign or deliver a single loan to the ARMT 2007-1 trust as of the closing date or within 90 days of the closing date.[8]

138.   Without an effective assignment of the mortgage notes, the securities issued by ARMT 2007-1 trust were not mortgage backed securities, but were essentially unsecured.[9]

139.   The prospectus supplement for ARMT 2007-1 states that the trust would hold good title to the loans and related documents and that MS Corp. will deliver to the trust or the applicable custodian on behalf of the trust on or before the closing date, among other things:

---

[8]  In order for the ARMT 2007-1 trust to qualify and enjoy the tax free status of a "real estate mortgage investment conduit" or "REMIC" under the U.S. Internal Revenue Code as the Registration Statement stated it would, all contributions to the REMIC (*i.e.*, the delivery of the mortgage loans into the trust) must have occur on the "start up date," or at most 90 days after this date.  The "start up date" is the "closing date" specified in the prospectus supplement.  The prospectus supplement represents that the trust will be a REMIC "assuming compliance with" the master servicing and trust agreement which implies that all assignments of the mortgage loans would be completed by 90 days after the closing date.

The prospectus supplement states that each custodian will review each mortgage file delivered by MS Corp. within 90 days after the closing date to confirm that each of the foregoing documents is in its possession and is property endorsed.  These representations were false and misleading and made by the Defendants with reckless disregard for their truth.  As described below, Defendants knew as of the closing date of the MBS transactions that they would not deliver valid assignments or the original notes to the related MBS trust on a timely basis as represented in the Registration Statements because based on Relator's information it was Defendants' practice not to do so.

[9]  *Fed Home Loan Bank of Chicago v. Bank of America Funding Corp.*, No. 10CH45033, 2012 WL 4364410 (Ill. Cir. Ct. Cook County Sept. 19, 2012) ("Defendants' claim that the Offering Documents never said that the notes would be validly transferred insinuates that Defendants wish this Court to believe that purchasers bought securities knowing that the underlying assets could not be enforced.").

- the original promissory note, or mortgage note, and any modification or amendment thereto endorsed in blank without recourse;

- the original instrument creating a first lien on the related mortgaged property, or the mortgage, with evidence of recording indicated thereon;

- except for mortgages held through the MERS System, an assignment in recordable form of the mortgage, the title policy or a commitment to issue the title policy about the related mortgaged property and, if applicable, all recorded intervening assignments of the mortgage.

## VI.   DEFENDANTS' USE OF FALSE RECORDS AND/OR STATEMENTS

140.   Plaintiff hereby incorporates by reference in this Complaint (i) every Registration Statement (including any prospectus supplement) for every MBS issued and (ii) every Offering Document relating to every CDO.

### A.   DEFENDANTS MISREPRESENTED MATERIAL INFORMATION WITH RESPECT TO THE MORTGAGE LOANS THAT COMPRISED THE MBS

141.   In connection with both the MBS and the CDOs, Defendants affirmatively misrepresented material information regarding the underlying mortgage loans originated and/or purchased by Defendants and packaged and sold to the MBS trusts.

142.   Defendants made certain false representations and warranties about the mortgage loans in the Offering Documents.  By way of example, an Offering Document for ARMT 2007-1 provides as follows:

> [E]ach mortgage note and related mortgage is a legal and binding obligation of the maker thereof, ***enforceable in all respects*** in accordance with its terms subject to bankruptcy and other laws affecting the rights of creditors and general equitable principles;
>
> ***Each mortgage loan at the time it was made complied in all material respects with applicable federal, state or local law, including, without limitation, predatory and abusive lending laws***;

none of the mortgage loans are classified as a "high cost home," "covered," "high-cost," "high-risk home" or "predatory" loan under applicable state, federal or local law;

*the information set forth in the mortgage loan schedule is complete, true and correct in all material respects as of the cut-off date*;

each mortgage loan *complies with all the terms, conditions and requirements of the originator's underwriting standards* in effect at the time of origination.

143.    Contrary to their statements, Defendants omitted the most important information relevant to purchasers - information relating to the inability of the borrowers to repay the mortgage loans and information related to the true value and quality of the properties securing the mortgages.  This information was available to the Defendants but Defendants intentionally concealed this information from purchasers.  As explained above, Defendants intentionally did not provide to investors the name of the borrowers or the addresses of the properties, even though they knew this information.  Defendants' decision left investors unable to conduct their own due diligence on the mortgage loans and unable to evaluate the ability of borrowers to repay their loans.  Defendants' obfuscation made it impossible for investors to determine if the information Defendants did provide in the Offering Documents was accurate.

144.    Relator's information reveals Defendants included multiple loans from the same borrower (and secured by units in the same development) in an MBS trust without disclosing this material fact to investors.  The Registration Statements were false and misleading because they omitted information regarding the concentration of loans secured by units in the same development.

145.    Relator's information also reveals that certain collateral properties that Defendants stated were owner-occupied in the loan tapes were not.  Occupancy status refers to

whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or a vacation home.  Based on Relators' information, far fewer underlying properties were occupied by their owners than was disclosed in the prospectus supplements and loan tapes and, correspondingly, more were held as second homes or investment properties.

146.    Instead, MBS purchasers were forced to rely exclusively on the disclosures in the Registration Statements about the MBS and the Offering Documents about each CDO and on Defendants' representations and warranties in the related Pooling and Servicing Agreement.

147.    The risk that these representations and warranties were inaccurate or incomplete was allocated in its entirety to Defendants through the "cure or repurchase" obligation.  By way of example, the prospectus supplement for ARMT 2007-1 provides as follows:[10]

> In the event of a breach of any representation or warranty relating to a mortgage loan that materially and adversely affects the interests of the certificateholders in that mortgage loan, DLJ Mortgage Capital will be obligated to do one of the following:
>
>   - *cure that breach*,
>
>   - *repurchase that mortgage loan at an amount equal to the sum of the unpaid principal balance of the mortgage loan on the date of repurchase*, and accrued interest on that mortgage loan at the applicable  mortgage rate from the date through  which interest was last paid by the mortgagor to the date of repurchase, or
>
>   - substitute a replacement mortgage loan for that mortgage loan.
>
> This substitution is permitted only within two years of the closing dates and may not be made unless an opinion of counsel is provided.

148.    Defendants' prospectus supplements included material misstatements about the properties, both on an individual loan basis and on a pool basis.  The prospectus supplements for

---

[10]  DLJ is required pursuant to Section 2.03(c) of the Pooling and Servicing Agreement for ARMT 2007-1 to repurchase any Mortgage Loan for which a representation and warranty made by DLJ under Section 2.03(b) is incorrect and which materially and adversely affects the interests of the Certificateholders in any mortgage loan.

each MBS sets forth in tabular form the number and/or percentage of mortgage loans with LTV

ratios within specified ranges.[11]  The prospectus supplements also list the weighted average

LTVs for the pools of mortgage loans.  The loan tapes for the MBS also represent the LTV and

CLTV ratios for each loan.  For all the MBS, the prospectus supplement specifies the maximum

LTV and/or the CLTV ratios for any loan in the related pool.

> i.  DEFENDANTS FALSELY CLAIMED THAT
>     NO CLTV RATIOS WERE ABOVE 100%

149.    The prospectus supplement for ARMT 2007-1 also stated that no CLTV

(combined-loan-to-value) ratios were above 100 percent ("each mortgage loan had a CLTV ratio

at origination of 100.00% or less").  Based on Relator's information, a material number of the

reviewed properties had CLTV ratios above 100 percent due to inflated appraisals/property

valuations.

150.    Relator's information demonstrates that the appraisals and property valuations

given to the reviewed properties were significantly higher than the actual value of such

properties on the date the related loan was made.  As a result, the LTV ratio represented in the

tables contained in the prospectus supplements for each MBS were materially understated as

were certain of the LTV and CLTV ratios for the individual loans set forth in the loan tapes.  The

denominator in the LTV ratio is the value of the mortgaged property.  An inflated appraisal will

understate the collateral risk associated with a given loan.

---

[11]  The prospectus supplement for ARMT 2007-1 defines "LTV" as follows:  The loan-to-value  ("LTV") ratio of a mortgage loan at any given time is a fraction, expressed as a percentage, the numerator of which is the stated principal balance of the mortgage loan at the date of determination and the denominator of which is (a) in the case of a purchase, the lesser of the selling price of the related mortgaged property and its appraised value determined in an appraisal obtained by the originator at origination of the mortgage loan or (b) in the case of a refinance, the appraised value of the mortgaged property at the time of such refinance.  The prospectus supplements for many of the MBS do not define "combined loan-to-value" rations but they do use the term CLTV.  Generally, a "CLTV" ratio is the original principal balance of the first lien mortgage loan plus, if applicable, the original principal balance of the second lien mortgage loan divided by the lesser of (a) the sales price or (b) the appraisal.

151.    The best evidence of actual value is an arms-length sale of a property.  Relator's information, which shows sales of properties, demonstrates that many collateral properties securing the relevant loans were significantly overvalued.  If a property's true value is significantly less than the value used for loan underwriting, then there is an increased risk that a borrower will not repay the loan and a risk of greater losses in the event of a default.  Mortgage loans with high loan-to-value ratios leave the related borrower with little or no equity in the related mortgaged property.  Relator's information shows most of the mortgage loans included in the MBS trusts had negative equity from the outset (*i.e.,* the property was worth less than the amount of a loan and LTVs were in excess of 100% at the time a loan was made).

152.    Relator uncovered inaccuracies in reported LTV ratios in the prospectus supplement for ARMT 2007-1.  These inaccuracies reveal that Defendants' appraisal process was reckless and flawed.  The Registration Statements state that the appraisers will be qualified, licensed and independent, that the appraisals will reflect the true value of a collateral property, that the property will be in good condition, and that the appraisers' compensation will not be dependent upon the amount of the loan or its consummation.

153.    Relator's information reveals that the appraisals of the properties securing the ARMT 2007-1 loans did not reflect the actual value of the underlying properties.  Independent appraisers following proper practices, and providing genuine estimates as to valuation, would not have provided the inflated appraisals as shown on the loan tapes.

154.    Defendants knew or should have known about the inflated appraisals.  DLJ and CS Financial originated a substantial number of the loans which were packaged into the MBS.  SPS was the servicer for these loans.  DLJ and CS Securities provided credit lines to third party originators and constantly monitored the inventory backing the credit lines.  Defendants knew or

should have known inflated appraisals were a pervasive problem.  Defendants were aware (or

should have been aware) that mortgage loans sold to the MBS, and mortgage loans backing

RMBS sold to the CDOs, were products of inflated appraisals.  Nevertheless, Defendants did not

disclose these material facts regarding inflated appraisals (or include a risk factor about inflated

appraisals) in the Registration Statements for the MBS or the Offering Documents for the CDOs.

**B.   DEFENDANTS AFFIRMATIVELY MISREPRESENTED PROPER DELIVERY AND ASSIGNMENT OF MORTGAGE DOCUMENTS**

155.   The prospectuses for the MBS also represent that the related CS depositor (either

MC Corp, MA Corp or ABSC as applicable) would deliver certain documents to the trustee (as

set forth in Section 2.01 of the Pooling and Servicing Agreements):

> In connection with such transfer and assignment, ***the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, a mortgage file for each mortgage loan*** which will consist of, among other things, the original promissory note, or mortgage note, and any modification or amendment thereto endorsed in blank without recourse (except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost), the original instrument creating a first lien on the related mortgaged property, or the mortgage, ***with evidence of recording indicated thereon***, an assignment in recordable form of the mortgage, the title policy or a commitment to issue the title policy about the related mortgaged property and, if applicable, all recorded intervening assignments of the mortgage and any riders or modifications to such mortgage note and mortgage except for any such document not returned from the public recording office, which will be delivered to the trustee or its custodian as soon as the same is available to the depositor. ***Assignments of the mortgage loans to the trustee or its nominee will be recorded in the appropriate public office for real property records***, except in states where, in the opinion of counsel, such recording is not required to protect the trustee's interest in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or the seller.

156.   The prospectus supplement states that:

> In lieu of providing the duly executed assignment and the original recorded assignment or assignments of the mortgage together with all interim recorded assignments of that mortgage, the depositor at its discretion may provide evidence that the related mortgage is held through the MERS(R) System.

This "in lieu of" language does not affect the depositor's obligation to provide to the trustee the original mortgage note endorsed in blank or "the original instrument creating a first lien on the related mortgaged property, or the mortgage," even for mortgages held through the MERS(R) System.

157.    The risk that CS depositors failed to deliver the original note and the other required mortgage documents was allocated in its entirety to Defendants through the cure or repurchase obligation.  Thus, the prospectus supplement for ARMT 2007-1 provides as follows:[12]

> if any document in a mortgage file is found to be missing or defective in a material respect and [DLJ] does not cure such defect within 90 days of notice thereof from the trustee or its custodian or within such longer period not to exceed 720 days after such date in the case of missing documents not returned from the public recording office, [DLJ] will be obligated to repurchase the related mortgage loan from the trust.

158.    Defendants knew, on the date the MBS were issued, as of the date of each prospectus supplement and as of the date of each mortgage loan purchase agreement, that they would not deliver the original notes or valid assignments (about non-MERS loans) to the related MBS trust on a timely basis - as was represented in the Registration Statements.   In fact, it was Defendants' practice not to do so.  As evidenced by their past practice of not delivering such assignments or notes, Defendants had no way of delivering a valid, timely assignment or the

---

[12] DLJ is required pursuant to Section 2.02(a) of the Pooling and Servicing Agreement to repurchase any Mortgage Loan for which any document is not delivered by the Depositor as required by Section 2.01of the Pooling and Servicing Agreement.

original note for any of the mortgage loans.  Defendants originated and/or purchased from originators mortgage loans that would be sold by Defendants into the MBS trusts and had the obligation to, and disclosed to purchasers that they would, deliver the original notes and valid assignments in a timely manner.  Defendants failed to do so for substantially all the mortgage loans for each of the dozens of MBS transactions.

159.    Defendants failed to disclose how many of the mortgage loans included in each MBS trust were registered with MERS under the MERS System.  As described above, Defendants furthered their fraud on investors by failing to file assignments in the name of the MBS trusts.  This allowed Defendants to conceal from investors the names of the borrowers and the addresses of the properties securing the mortgage loans owned by the MBS trusts.  By  filing the mortgages in the name of "MERS" and registering the assignment to the trust in the "MERS System," the Defendants were able to further their fraud because investors had no way to determine what mortgage loans a MBS trust owns.  While the prospectuses for certain of the MBS mentioned that some mortgage loans may be held through the MERS System, the Defendants failed to disclose how many or what percentage of mortgage loans were held in the MERS System.  Relator's information reveals that for all or substantially all loans originated by DLJ and CS Financial, the mortgages were in the name of MERS.  Defendants intentionally omitted to disclose the high percentage of mortgages registered in the MERS System that were owned by the MBS trust .

160.    Defendants understood the risks to the MBS of holding mortgage loans through the MERS System.  In a limited number of prospectus supplements for only certain MBS, Defendants included a formal "risk factor" section setting forth certain risks associated with the MERS System.  For example, the prospectus supplement for HEMT 2007-1 includes a "risk

factor" entitled "The recording of mortgages in the name of MERS may affect the yield on the

Notes" which states:

> The mortgages or assignments of mortgage for some of the
> mortgage loans may be recorded in the name of Mortgage
> Electronic Registration Systems, Inc, or MERS, solely as nominee
> for the originator and its successors and assigns.  Subsequent
> assignments of those mortgages are registered electronically
> through the MERS(R) System.  However, if MERS discontinues
> the MERS(R) System and it becomes necessary to record an
> assignment of the mortgage to the indenture trustee, then any
> related expenses shall be paid by the issuing entity and will reduce
> the amount available to pay principal of and interest on the
> outstanding class or classes of securities with the lowest payment
> priorities.  The recording of mortgages in the name of MERS is a
> new practice in the mortgage lending industry. Public recording
> officers and others may have limited, if any, experience  with
> lenders seeking to  foreclose mortgages, assignments  of which
> are  registered with  MERS.  Accordingly, delays and additional
> costs in commencing, prosecuting and completing foreclosure
> proceedings and conducting foreclosure sales of the mortgaged
> properties could result.  Those delays and additional costs could in
> turn  delay   the   distribution  of  liquidation  proceeds   to
> securityholders and increase the amount of losses on the mortgage
> loans.

161.    Defendants acknowledge in the prospectus supplement for HEMP 2007-1 that

holding a loan in the MERS System is risky and could subject the certificateholders to additional

losses but Defendants failed to disclose the number of loans held by the HEMT 2007-1 trust that

are registered in the MERS System even though Defendants had such material information.

Defendants failed to include a MERS risk factor in the majority of the MBS prospectus

supplements including the prospectus supplement for ARMT 2007-1 notwithstanding

Defendants knowledge of the risks associated with foreclosing on mortgages held through the

MERS System.[13]

---

[13]  In addition, the risk factor itself was misleading.  The risk factor suggests that it would only be necessary to
record an assignment to the trustee "if MERS discontinues the MERS System."  In fact, such an assignment is

162.    In addition to omitting material facts regarding (i) the credit quality of borrowers, (ii) the overvaluation of properties contained in the Registration Statements, and (iii) the assignment of mortgage loans, the Registration Statements also contained misstatements about credit ratings and compliance with underwriting guidelines.

### C.    THE CDO CREDIT RATINGS WERE MATERIALLY FALSE

163.    Credit ratings are assigned to the tranches of securities in mortgage-backed securitizations by the credit rating agencies, including Moody's Investors Service, Standard & Poor's, and Fitch Ratings.  In general, a AAA rating is at the top of the credit rating scale and is intended to designate the safest investments.  At the time the MBS and CDOs were rated, AAA investments historically experienced a loss rate of less than .05 percent and investments with a BBB rating historically experienced a loss rate of less than one percent.  As a result, RMBS securities with credit ratings between AAA or its equivalent through BBB or its equivalent were generally referred to as "investment grade."

164.    Each tranche in a MBS and CDO received a credit rating upon issuance, which purported to describe the riskiness of that tranche.  CS reported the credit ratings for each tranche in the Prospectus Supplements for the MBS and Offering Documents for the CDOs.  The accuracy of these ratings was material to a reasonable purchaser's decision to purchase the securities.

165.    Defendants provided loan-level information to the rating agencies that they relied upon to assign ratings to the MBS, including the borrower's LTV ratio, debt-to-income ratio, owner occupancy status, and other loan-level information.  Because Defendants knew or should

---

necessary under applicable law to commence any foreclosure proceeding because MERS as nominee does not have standing to commence foreclosure proceedings.  For this reason, the disclosure in the prospectus supplements that include the MERS risk fact is false and misleading.

have known (acting with reckless disregard for the truth) that the information they provided to the rating agencies was false, Defendants knew or should have known that the ratings set forth in the related prospectus supplement for each MBS were inflated, incorrect and misleading.  In addition, the level of subordination that the rating agencies required for the respective class of MBS was inadequate to provide purchasers with the level of protection that those ratings signified.  As a result, purchasers paid Defendants inflated prices for the MBS and CDOs, unaware that the securities they purchased or otherwise acquired actually carried a materially higher risk of loss than represented by the ratings.

   D. **DEFENDANTS FAILED TO COMPLY WITH UNDERWRITING GUIDELINES DESPITE REPRESENTING TO THE CONTRARY IN THE OFFERING DOCUMENTS**

   166. Relator's information demonstrates that Defendants failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans sold to a MBS trust were not defective and otherwise complied with the representations in the Registration Statements.  The mortgage loans included in the MBS were comprised of loans originated by DLJ and/or CS Financial, and loans originated by third party originators.

   167. Based on Relator's information, it appears that neither DLJ nor CS Financial applied any standards in approving loans that were included in the MBS trusts.  Apparently, DLJ and CS Financial would routinely approve and originate loans where the borrowers clearly did not have the ability to repay and where the property securing the loan was grossly overvalued, and would include such loans in the MBS trusts.  The Registration Statements were false and misleading because they omitted information regarding the utter lack of underwriting standards for loans originated by DLJ and CS Financial.

   168. Defendants' guidelines required them to conduct due diligence on each mortgage loan pool purchased from third party originators to ensure the originator's compliance with its

stated underwriting guidelines.  Relator's information reveals most of the mortgage loans sold to the MBS trusts should have been excluded.  Defendants intentionally did not ensure these mortgage loans were underwritten in accordance with applicable guidelines (or had compensating factors).  CS sold such mortgage loans to the MBS knowing they didn't meet the guidelines.

169.    Relator's information reveals most of the loans sold to the MBS trusts did not conform to the underwriting standards of the third-party originators (as Defendants stated in the Registration Statements).  DLJ claimed it sold to the depositor of an MBS trust only those mortgage loans meeting a third-party originator's underwriting guidelines.  CS also promised an additional level of protection.  Defendants claimed the CS depositor would select each mortgage loan from those offered by its CS affiliate on an individualized basis, stressing compliance with the originator's representations and warranties.  Relator's information shows most of the mortgage loans did not meet the originator's underwriting guidelines.  Defendants knew (or should have known) there were high percentages of defective loans but included such loans in the MBS trusts anyway.  Defendants omitted to disclose this material information in the Offering Documents.

170.    The prospectus supplements for each MBS described the mortgage loan underwriting guidelines.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and value of a collateral property.

171.    For example, the prospectus supplement for the ARMT 2007-1 trust purports to describe the underwriting standards for each such originator.  With respect to the Countrywide underwriting guidelines, the prospectus supplement states:

> Countrywide Home Loans' underwriting standards are applied by
> or on behalf of Countrywide Home Loans to evaluate the

prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

172.   The prospectus supplement for ARMT 2007-1 sets forth the maximum DTI ratios

permitted under Countrywide's different underwriting guidelines.

Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.
. . .
Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

173.   Similarly, the prospectus supplement for ARMT 2007-1 sets forth the maximum

LTV ratios permitted under Countrywide's different underwriting guidelines.

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000 . . .

The prospectus supplement specifies the maximum LTV ratios for "cash out refinances," investment properties and second homes under Countrywide's underwriting guidelines, which are lower than those for its standard underwriting guidelines.

174.    Relator's information shows each originator systematically disregarded its respective underwriting guidelines.  This conclusion is confirmed by the systematically misreported owner occupancy, LTV and DTI statistics uncovered by Relator's loan-level review. The conclusions from Relator's information are supported by (1) the collapse of the MBS' credit ratings; and (2) the surge in delinquency and default in the mortgages purportedly securing the MBS; and (3) the low recovery amounts in the mortgaged property securing the mortgage loans.

175.    Defendants had the opportunity to review the loan files for each loan as part of their due diligence in the securitization process.  Had Defendants undertaken that review, they would have discovered that the actual underwriting practices of the originators, including the non-party originators listed above, were vastly inconsistent with the statements in the Registration Statements regarding the high underwriting standards of the third party originators.

176.    The prospectus supplements for the MBS generally provide that DLJ represent in the pooling and servicing agreement or trust agreement that "***each mortgage loan complies with all the terms, conditions and requirements of the originator's underwriting standards in effect at the time of origination***" and that DLJ would buy back or replace any loan that didn't comply. The prospectuses for each MBS also state that the CS Depositor (MS Corp, MA Corp or ABSC) "will not include any mortgage loan in the trust fund for any series of certificates if anything has come to the depositor's attention that would cause it to believe that the representations and warranties of a seller will not be accurate and complete in all material respects in respect of the related mortgage loan as of the related Cut-off Date."

177. Relator's information reveals that the originators that sold loans to DLJ that were included in the MBS trusts had serious underwriting breakdowns and that the statements regarding compliance with the underwriting guidelines of such originators in the Registration Statements were false or material misleading.

178. Defendants included these false and misleading statements in order to make investors comfortable with the quality of the mortgage loan originators and the specific loan portfolios that were being included in each MBS trust in order to induce investors not to conduct their own due diligence and not to ask further questions about the mortgage loans, including about the names and addresses of the borrowers.

179. Because the rating agencies assigned ratings to the MBS based on information about the mortgage collateral provided by the Defendants, the ratings on the MBS were artificially inflated because the information about the mortgage loan collateral provided by the Defendants was false and misleading. Defendants made the very same material omissions and misrepresentations to the rating agencies that they made to investors in the Registration Statements. These omissions and misrepresentations were reflected in the artificially inflated ratings on the MBS.

180. Since the issuance of the MBS, the rating agencies have dramatically downgraded their ratings, reflecting the true underwriting practices used to originate the mortgage loans, and the true value and credit quality of the mortgage loans. For example, the ratings on the Class 5-A-1 Certificates issued by ARMT 2007-1 which were initially rated Aaa by Moody's at issuance on February 28, 2007 were placed on review for possible downgrade by Moody's by April 23, 2008, only 14 months after the closing date. The Class 5-A-1 Certificates were downgraded to Baa2 in September 2008, to Caa2 in February 2009, and to Ca in September

2010.  The other MBS have suffered similar ratings downgrades.

181.    Relator's information has revealed massive delinquency and default rates of the mortgage loans backing the MBS, further proof that the mortgage loans were not originated in adherence to the stated underwriting guidelines.  The majority of the MBS purchased or funded by the U.S. Government were rated single-A to triple-AAA and were represented as long-term, stable investments.  However, a significant percentage of the mortgage loans backing the MBS have defaulted, have been foreclosed, or are delinquent, resulting in massive losses to holders. The overall poor performance of the mortgage loans is a direct consequence of the fact that they were defective from the start and not underwritten in accordance with the applicable underwriting guidelines as represented in the Registration Statements.

182.    Mortgage loans that were properly underwritten in accordance with the standards represented in the Registration Statements would have experienced substantially fewer defaults, fewer foreclosures, and fewer delinquencies than occurred on the mortgage loans purportedly securing the MBS.  Mortgage loans that were properly underwritten using the appraisal and valuation methods and standards represented in the Registration Statements would not have experienced the massive losses demonstrated by Relator's information.

###### E.    DEFENDANTS OMITTED AND MISREPRESENTED MATERIAL INFORMATION IN THE OFFERING DOCUMENTS FOR THE CDOS

183.    In connection with each CDO transaction, CS Securities created a marketing/pitch book and/or term sheet that described the key features and terms of the deal.  Specific information about the collateral manager's history and business experience was prepared by the collateral manager, but otherwise the information was created by CS Securities.  After the pitchbook and/or term sheet was delivered to purchasers, CS Securities would prepare an offering circular, which would also describe terms of the CDO transaction, including the capital

structure, the collateral debt securities, the manager and certain risk factors.[14]  Often, as part of

the Offering Documents, CS Securities would provide purchasers with historical performance

analysis that showed very low default and loss rates, and high recovery rates, on mortgage

related securities such as RMBS which suggested that the default cushions on the CDO securities

that were often provided in the Offering Documents were more than sufficient to protect the

investment.[15]  The Offering Documents were prepared by the CDO desk at CS Securities and

were distributed by the marketing staff employed by CS Securities' CDO desk to the Failed

Credit Unions, the Failed Banks, the Failed Pension Plans and the other Government Entities that

the marketing staff covered.  Such entities reasonably relied on the Offering Documents.

184.    Defendants' false statements and material omissions made in connection with the

Offering Documents have never been retracted and have endured in form and effect to the

present.  Thus all financing, guarantees, insurance, and payments associated with the CDOs

made by the U.S. Government were made further to and in view of Defendants' false statements,

including the Offering Documents.

185.    As described above, the Defendants' purchased huge numbers of defective loans

and included them as collateral for the MBS.  CS Securities would then sell its unsold inventory

---

[14]   The offering circulars for the CDOs would often state that it was prepared by the co-issuers, which are special
purpose entities that had no employees and were created solely to purchase the collateral debt securities and issue
notes.  CS Securities was the sponsor, structurer, arranger, initial purchaser and placement agent for each CDO
transaction.  CS Securities, not the co-issuers, actually prepared the Offering Circulars and any representation to the
contrary in the Offering Documents is false.  *See United States SEC v. Citigroup*, 11 Civ. 7387 (JSR), 2011 U.S.
Dist. LEXIS 135914 at*14-*15 (S.D.N.Y. Nov. 28, 2011), at ¶ 39.  Investors did not have contact with the co-
issuers and each purchased securities in the CDOs directly from CS Securities, which was the initial purchaser and
placement agent.   CS Securities disseminated the Offering Circular and pitch book for the CDOs directly to
purchasers, not the issuers.

[15]   The Offering Documents would often provide a break-even statistical default analysis that was an important
metric for evaluating the aggregated risk of default of the thousands of mortgages and MBS that served as the
collateral for the CDOs.  These risks appeared low in light of the default cushions built into the CDOs relative to
historical performance provided by CS Securities, assuming the collateral was similar as suggested by CS Securities.
However, CS Securities knew the mortgage collateral in the CDOs was not similar to mortgage loans which formed
the basis of the historical performance data provided to investors.

of MBS (and other CDOs) to the CDOs.  However, CS Securities failed to disclose to purchasers of the CDOs the same material information Defendants failed to disclose to purchasers of the MBS described above.

186.    The Offering Documents for each CDO represented that the collateral was comprised of a certain percentage of "mortgage backed securities."  However, each of these representations was false and misleading because the securities that purportedly were mortgage-backed were not secured by notes and mortgages.  As demonstrated by Relator's information and described above, because neither valid assignments nor original notes were delivered to the MBS trusts which were collateral for the CDOs, those MBS trusts never legally owned the notes and related mortgages.  Simply put, the MBS were not "mortgage backed securities" as defined by the Offering Documents.

187.    CS Securities failed to disclose to CDO purchasers the same information it failed to disclose to MBS purchasers, including the poor borrower credit and inflated property valuations about notes and mortgages that were purportedly owned by MBS or the RMBS that were used as collateral for the CDOs.  CS Securities also did not disclose to purchasers of the CDOs material information regarding instances of fraudulent and/or poor underwriting by the third-party loan originators who sold mortgage loans to certain of the Defendants who then sold such loans to purchasers of the MBS or to sponsors of RMBS that were used as collateral for CDOs.  Instead, CS Securities sold MBS and RMBS to the CDOs which it knew, or should have known, were secured by mortgage loans which were both defective and which did not conform to the underwriting standards set forth in the Prospectus Supplements for such MBS or RMBS.

F.   **DEFENDANTS WERE CLOSELY INVOLVED IN
EVERY STEP OF THE SECURITIZATION PROCESS**

188.   Defendants are directly responsible for the omissions and misstatements of material fact contained in the Registration Statements for the MBS because they prepared, signed, filed and/or used these documents to market and sell the MBS, and/or directed and controlled such activities and chose the trustee for each MBS trust.

189.   As described above, DLJ and CS Financial originated a substantial number of the loans that were packaged into the MBS (e.g., 24% of loans included in the ARMT 2007-1 transaction).  SPS was the servicer for these loans.  Defendants were the source of all information about these mortgage loans since Defendants originated these loans.  The blame for the poor quality and haphazard diligence on the loans included in ARMT 2007-1 falls squarely on Defendants.

190.   Defendants also selected the third party mortgage originators from which to obtain additional mortgage loans, selected the loans to include in each MBS trust, and chose the servicer of the loans and the parties to administer the MBS trust.  Defendants had regular contact, and a direct contractual relationship, with the third party originators that originated the mortgage loans.

191.   As the originator of many of the mortgage loans included in the MBS trust, Defendants possessed the documentation supporting each mortgage loan (the "Loan File"), which typically includes the borrower's loan application, credit report, income, asset and employment verifications, lien disclosures and appraisal of the subject property.[16]  Defendants

---

[16] The Prospectus for ARMT 2007-1 provides that "[g]enerally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information about its assets, liabilities, income (except as described below), credit history, employment history and personal

also received the Loan File for each mortgage loan purchased from third-party originators, as part of their purchase.

192.    Defendants selected the mortgage loans to place in each MBS trust with full access to detailed information on each borrower and property and thus had the ability to ensure the disclosures in the Offering Documents were both accurate and complete and did not contain any omissions of material fact.  Defendants had access to information to determine whether their representations and warranties in the relevant purchase agreements DLJ had with third party originators were accurate.  By contrast, potential purchasers had only one source of information about the mortgage loans: Defendants.  Potential purchasers had no means to verify the accuracy of information they received from Defendants.

## VII.   THE U.S. GOVERNMENT FUNDED THE PURCHASE OF MBS AND CDOS AND SUFFERED SUBSTANTIAL LOSSES

### A.    PURCHASES BY THE U.S. GOVERNMENT

193.    The U.S. Government has purchased or financed the purchase of MBS and CDOs through many avenues, including, without limitation, through purchases by the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, the FRBNY, the Federal Home Loan Banks, PPIFs, the Maiden Lane Entities, CS Holdings itself and Fannie Mae and Freddie Mac, who each purchased or otherwise acquired billions of dollars of the MBS and CDOs with funding provided by the U .S. Government, and through direct purchases by the Federal Reserve and the Treasury (collectively, the "Government Purchasers").

194.    The Failed Credit Unions, Failed Banks and Failed Pension Plans were each federally insured institutions and one or more of such entities purchased MBS and CDOs, either

---

information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy."

directly or indirectly (including purchase of other CDOs that contained MBS or CDOs as collateral).

195.     In 2008, to respond to the financial crisis, the Federal Reserve Board authorized the FRBNY to facilitate the formation of three Maiden Lane Entities, each of which is a separate limited liability company.  The assets and liabilities of each Maiden Lane Entity are consolidated onto the books of the FRBNY and are essentially owned by the FRBNY.  The Maiden Lane Entities purchased or acquired Defendants' MBS and CDOs.

196.     On March 23, 2009, the U.S. Treasury, in conjunction with the FDIC and the Federal Reserve Bank, announced the creation of the Public-Private Investment Partnership ("PPIP") of 2009, as a part of the government's Financial Stability Plan.  Under the PPIP, the Treasury provides equity and debt financing to newly-formed public-private investment funds ("PPIFs") established by fund managers with investors for the purpose of purchasing legacy securities from financial institutions.  These securities include non-GSE RMBS.[17]  The PPIF Managers purchased Defendants' MBS.

### B.     DAMAGES TO THE U.S. GOVERNMENT

#### i.     IMPAIRED VALUE OF MBS

197.     Each of the Defendants named herein participated in originating and/or purchasing from third-party originators residential mortgage loans that were included in the MBS trusts and selling the MBS to investors, including to the U.S. Government, using the false

---

[17] According to a U.S. Treasury press release:

> The PPIP is designed to encourage the transfer of certain illiquid legacy real estate-related assets off of the balance sheets of financial institutions, restarting the market for these assets and supporting the flow of credit and other capital into the broader economy. PPIP funds established under the legacy loan program will be established to purchase troubled loans from insured depository institutions and PPIP funds established under the legacy securities program to purchase from financial institutions legacy non-Agency RMBS and newly issued and legacy CMBS that were originally AAA rated. PPIFs will have access to equity capital from the U.S. Treasury as well as debt financing provided or guaranteed by the U.S. government.

records described herein.  As set forth above, Defendants acting with reckless disregard of the truth, made false representations about the quality of the mortgage loans sold to the MBS trusts, including at the time the MBS were acquired by the U.S. Government.  Such mortgage loans failed to conform to the underwriting standards of the originators and of the Defendants and failed to conform to the representations and warranties in the pooling and servicing agreements, trust agreements, assignment and assumption agreements and mortgage loan purchase agreements as disclosed in the Registration Statements and Offering Documents.  Because of the false loan-level information, inflated appraisals and other false records that Defendants provided to the rating agencies to obtain high credit ratings on the MBS, the investment grade MBS had inadequate subordination to absorb the massive losses from defective loans and collateral properties.

198.    In addition, each of the Defendants named herein participated in creating the MBS trusts that failed to include valid assignments or the original notes, and concealed such material fact from purchasers, including from the U.S. Government.  As described herein, the Registration Statement for each of the MBS states that the original notes and that valid assignments would be delivered on the closing date for each MBS trust.

199.    Because of the missing assignments and original notes, in any foreclosure action, the MBS trust will be unable, or will have to expend significant funds, to prove that the trust is the lawful owner of the subject note and mortgage.  This is true especially for mortgages that are held in the name of "MERS" because MERS is not the owner of the mortgage note and MERS as nominee cannot lawfully commence a foreclosure action.  The amount the MBS trusts will spend to prove their ownership is materially more than they would have spent if the Defendants delivered the original notes and a valid assignment in a timely manner as described in the

Registration Statements. In addition, the value of the MBS must be discounted to account for the risk that a court may not recognize the MBS trust as the legal owner of the note and mortgage, and may deny foreclosure on the mortgaged property. The cost to establish that the MBS trust is the owner of a note and mortgage is a financial harm to the U.S. Government, as a purchaser of the MBS.

200.    In all, as a result of Defendants' fraudulent conduct, the value of the MBS acquired and currently owned by the U.S. Government have been substantially impaired.

201.    The U.S. Government has realized losses on its purchases of MBS and CDOs as a result of Defendants' malfeasance. For example, one of the Failed Credit Unions purchased $60,000,000 principal amount of the Class 5-A-1 Certificates (CUSIP 007037AE4) issued by ARMT 2007-1. The National Credit Union Administration, as Liquidating Agent, acquired such securities as a legacy asset and securitized such asset as part of the NCUA Guaranteed Note Program. The NCUA transferred such security to the NCUA Guaranteed Notes Trust 2011-R4 in or around March 2011 and payment on the notes issued by such trust is guaranteed by the NCUA and backed by the full faith and credit of the United States. Since March 2011, the NCUA has reported that the $60,000,000 Class 5-A-1 Certificates of ARMT 2007-1 owned by the NCUA 2011-R4 trust have suffered cumulative realized losses of $7,571,460.46 through November 8, 2014, and as a result the NCUA has suffered similar losses (and continues to suffer losses) on its guaranty.

202.    The FRBNY lost money on ARMT 2007-1, too. ML II LLC acquired $11,156,000 principal amount of certificates (CUSIP 007037BH6) issued by Adjustable Rate Mortgage Trust (ARMT) 2007-1 trust for $2,047,826.92 on or around December 12, 2008 and sold such securities for $1,003,469 on or around January 24, 2012, realizing a loss of $859,501.

ii. IMPAIRED VALUE OF CDOs

203.    Each of the Defendants named herein participated in originating the MBS that were used as collateral for the CDOs.  In addition, certain of the Defendants participated in purchasing RMBS from third parties that were included in the CDOs and selling the CDOs to purchasers, including to the U.S. Government, using the false documents described herein.  As set forth above, CS Securities, acting with reckless disregard of the truth, omitted material information and made false representations about the quality of the MBS and RMBS included as collateral in the CDOs and failed to disclose to purchasers the lack of underwriting and quality control about the underwriting and acquisition of the mortgage loans underlying the MBS trusts whose securities the CDOs acquired.

204.    As underwriter of the CDOs, CS Securities knew or should have known if it had conducted any due diligence, that the mortgage loans underlying the MBS that were used as collateral for the CDOs failed to conform to the underwriting standards of the originators, and knew or should have known that the investment grade credit ratings on such MBS were inflated and that such MBS trusts were missing lawful assignments of the notes and mortgages.

205.    As a result of Defendants' misconduct, the value of the CDOs acquired, insured, guaranteed or otherwise funded by the U.S. Government has been substantially impaired.

iii. DAMAGE TO FANNIE MAE AND FREDDIE MAC

206.    Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Entities" or "GSEs") each purchased or insured MBS and CDOs and incurred millions of dollars of losses on such securities based on Defendants' material omissions and misrepresentations, false statements and claims.  As a result of Defendants' knowing, deliberate and reckless actions and the losses sustained by Fannie Mae and Freddie Mac from the purchase of the MBS and CDOs, on September 6, 2008, the Director of FHFA placed Fannie Mae and Freddie Mac into

conservatorships pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"); the U.S. Government has had to pay in excess of $180 billion to Fannie Mae and Freddie Mac.

207.    Defendants' knowing, deliberate and reckless conduct described herein has affected the investors in the GSEs, including numerous federally insured financial institutions (including the Failed Banks, Failed Credit Unions and the Failed Pension Plans) who incurred stock losses and unpaid dividends resulting from the conservatorship of the GSEs.  The placement of Fannie Mae and Freddie Mac into conservatorship wiped out virtually all of the value of the outstanding preferred stock in the two companies.

### iv. DAMAGES TO THE FAILED CREDIT UNIONS, THE FAILED BANKS, THE FAILED PENSION PLANS

208.    One or more of the Failed Banks, Failed Credit Unions and Failed Pension Plans purchased MBS and/or CDOs and incurred millions of dollars of losses on such securities based on Defendants' material omissions and misrepresentations, false statements and claims.  As a result of Defendants' knowing, deliberate and reckless actions and the losses sustained by such entities from the purchase of the MBS and CDOs, such entities failed and the U.S. Government has had to pay millions of dollars in connection with the failure of such entities.

### v. DAMAGES TO AIG

209.    AIG purchased or insured billions of dollars of MBS and CDOs and incurred billions of dollars of losses on such securities based on Defendants' material omissions and misrepresentations, false statements and claims.  As a result of Defendants' knowing, deliberate and reckless actions and the losses sustained by AIG, on September 16, 2008, the Federal Reserve provided AIG with an $85 billion credit line.  In addition, on October 3, 2008, AIG received a $37.8 billion bailout from the Treasury under the Troubled Asset Relief Program (TARP).  On November 25, 2008, AIG received an additional $40 billion under TARP and on

March 2, 2009, AIG received an additional commitment of $29.8 billion under TARP, in each case as a result of Defendants' misconduct described herein.  Because the Government had billions invested in AIG through various government programs, the Government suffered losses (or forgone profits) on these investments due to the damage caused to AIG by Defendants' misconduct described herein.

## VIII.  CLAIMS FOR RELIEF

A.      **COUNT ONE**

**FOR DAMAGES AND PENALTIES UNDER THE FALSE CLAIMS ACT**
**(31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))**

210.    Relator incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

211.    As set forth above, Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard of the truth, omitted to disclose material information and made false representations about the quality of the mortgage loans included in the MBS at the time of their sale to the trustee for the benefit of the certificateholders of the related MBS trust and omitted to correct these material omissions and false representations thereafter.

212.    As set forth above, Defendants knowingly, or acting with deliberate ignorance and/or with reckless disregard of the truth, omitted to disclose material information and made false representations about the quality of the MBS and RMBS securing the CDOs and the mortgage loans securing such MBS at the time of sale to the related CDO and omitted to correct these material omissions and false representations thereafter.

213.    As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, presented and/or caused to be presented, a false or fraudulent claim for payment or approval in connection with the sale of the mortgage loans to the MBS, the

sale of the MBS and other RMBS to the CDOs and the sale of the MBS and the CDOs to the Government Purchasers.

214.    Defendants' misrepresentations and omissions were capable of influencing, and thus were material to, the Government Purchasers' decisions about purchasing, financing, insuring or guaranteeing, directly or indirectly, the MBS and the CDOs.

215.    The U.S. Government has purchased or financed, insured or guaranteed, directly or indirectly, the purchase of the MBS and CDOs through many Government Purchasers, including, without limitation, through purchases by the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, the FRBNY, PPIFs, the Maiden Lane Entities, the Federal Home Loan Banks, AIG, U.S. Treasury, and Fannie Mae and Freddie Mac.  Each such purchaser is "a contractor, grantee, or other recipient" within the meaning of 31 U.S.C. § 3729(b)(2).  In addition, the U.S. Government funds used to bail out the Failed Credit Unions, the Failed Banks, the Failed Pension Plans, AIG and Fannie Mae and Freddie Mac, and to finance the PPIFs and the Maiden Lane Entities, were used to "advance a Government program or interest," within the meaning of 31 U.S.C. § 3729(b)(2).  The U.S. Government "reimbursed" such purchasers of the MBS and CDOs for damages they suffered from the false and fraudulent claims for payment made by Defendants.  The U.S Government has incurred losses as a direct result of the Defendants' misrepresentations and omissions

216.    By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(l)(A), for each of the mortgage loans sold to the MBS that failed to conform to the disclosures in the Registration Statements or failed to conform to the representations and warranties made by the Defendants in the pooling and servicing agreements, assignment and assumption agreements or similar documents such as trust agreements or mortgage loan purchase

agreements, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, presented and/or caused to be presented a fraudulent claim for payment or approval.

217.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(l), Defendants are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claim herein, plus three (3) times the amount of damages which the U.S. Government has sustained because of Defendants' actions.

B.    **COUNT TWO**

**FOR DAMAGES AND PENALTIES UNDER THE FALSE CLAIMS ACT**
**U.S.C. § 3729(a)(2)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B)**

218.    Relator incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

219.    As set forth above, Defendants' knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with the sale of the mortgaged loans to the trustee on behalf of the certificateholders of the MBS, the sale of the RMBS and other mortgage collateral to the CDOs and the sale of the MBS and the CDOs to the Government Purchasers.

220.    Defendants' misrepresentations and omissions were capable of influencing, and thus were material to, the Government Purchasers' decisions about purchasing, financing, insuring or guaranteeing, directly or indirectly, the MBS and the CDOs.

221.    U.S. Government funds have been used to purchase the MBS and CDOs and to reimburse the losses incurred by the Government Purchasers from their purchases of the MBS

and CDOs.  The U.S Government has incurred losses as a direct result of the Defendants' misrepresentations and omissions.

222.    By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(1)(B), for each of the mortgage loans sold to the MBS that failed to conform to the disclosures in the Registration Statements or failed to conform to the representations and warranties in the pooling and servicing agreements, assignment and assumption agreements or similar documents such as trust agreements or mortgage loan purchase agreements, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims.

223.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the U.S. Government has sustained because of Defendants' actions.

C.    **COUNT THREE**

**FOR DAMAGES AND PENALTIES UNDER THE FALSE CLAIMS ACT
(31 U.S.C. § 3729(a)(7)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(G))**

224.    Relator incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

225.    As set forth above, Defendants knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, concealed or improperly avoided or decreased their obligations to repurchase defective mortgage loans from the MBS trusts in accordance with their obligations as disclosed in the Registration Statements and/or under the pooling and servicing agreements,

assignment and assumption agreements or similar documents such as trust agreements or mortgage loan purchase agreements.

226.    By virtue of the acts described above, and in violation of 31 U.S.C. §3729(a)(1)(G), for each of the mortgage loans sold to the MBS that failed to conform to the representations and warranties in the pooling and servicing agreements, assignment and assumption agreements or similar documents such as trust agreements or mortgage loan purchase agreements, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, concealed or improperly avoided or decreased its obligation to repurchase defective mortgage loans from the MBS trusts.

227.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each mortgage loan it improperly failed to repurchase, plus three (3) times the amount of damages which the U.S. Government has sustained because of Defendants' actions.

## IX.    PRAYER FOR RELIEF

WHEREFORE, the Relator respectfully request that judgment be entered in its favor and against Defendants as follows:

a.  On Counts One, Two and Three (False Claims Act), a judgment against all Defendants for treble damages and civil penalties for the maximum amount allowed by law;

b.  For an award of costs pursuant to 31 U.S.C. § 3729(a) and 31 U.S.C. § 3730(d); and

c. For such further relief that the Court deems just.

## X. DEMAND FOR TRIAL BY JURY

The Relator respectfully demands a trial by jury for all issues so triable as a matter of right.

RESPECTFULLY SUBMITTED this 23rd day of December, 2014.

BLEICHMAR FONTI TOUNTAS & AULD LLP

By: *Joseph A. Fonti /jr*

Joseph A. Fonti (JF-3201)
Jeffrey R. Alexander (JA-3849)
7 Times Square, 27th Floor
New York, NY 10036
Office: (212) 789-1340
Fax: (212) 205-3960
jfonti@bftalaw.com
jalexander@bftalaw.com

*Counsel for Relator*

**Annex A**

<u>MBS</u>

| |
|---|
| ARMT 2004-1 |
| ARMT 2004-2 |
| ARMT 2004-3 |
| ARMT 2004-4 |
| ARMT 2004-5 |
| ARMT 2005-1 |
| ARMT 2005-2 |
| ARMT 2005-3 |
| ARMT 2005-4 |
| ARMT 2005-5 |
| ARMT 2005-6A |
| ARMT 2005-7 |
| ARMT 2005-8 |
| ARMT 2005-9 |
| ARMT 2005-10 |
| ARMT 2005-11 |
| ARMT 2005-12 |
| ARMT 2006-1 |
| ARMT 2006-2 |
| ARMT 2006-3 |
| ARMT 2006-4 |
| ARMT 2007-1 |
| ARMT 2007-2 |
| ARMT 2007-3 |

| |
|---|
| CSAB 2006-1 |
| CSAB 2006-2 |
| CSAB 2006-3 |
| CSAB 2006-4 |
| CSAB 2007-1 |

| |
|---|
| CSFB 2003-1 |
| CSFB 2003-10 |
| CSFB 2003-11 |
| CSFB 2003-17 |

| |
|---|
| CSFB 2003-19 |
| CSFB 2003-21 |
| CSFB 2003-23 |
| CSFB 2003-25 |
| CSFB 2003-27 |
| CSFB 2003-29 |
| CSFB 2003-7 |
| CSFB 2003-8 |
| CSFB 2003-AR12 |
| CSFB 2003-AR15 |
| CSFB 2003-AR18 |
| CSFB 2003-AR2 |
| CSFB 2003-AR20 |
| CSFB 2003-AR22 |
| CSFB 2003-AR24 |
| CSFB 2003-AR26 |
| CSFB 2003-AR28 |
| CSFB 2003-AR30 |
| CSFB 2003-AR5 |
| CSFB 2003-AR9 |
| CSFB 2003-CF14 |
| CSFB 2004-1 |
| CSFB 2004-3 |
| CSFB 2004-4 |
| CSFB 2004-5 |
| CSFB 2004-6 |
| CSFB 2004-7 |
| CSFB 2004-8 |
| CSFB 2004-AA1 |
| CSFB 2004-AR1 |
| CSFB 2004-AR2 |
| CSFB 2004-AR3 |
| CSFB 2004-AR4 |
| CSFB 2004-AR5 |
| CSFB 2004-AR6 |
| CSFB 2004-AR7 |
| CSFB 2004-AR8 |
| CSFB 2004-CF2 |
| CSFB HEMT 2004-FRE1 |
| CSFB 2005-1 |

| |
|---|
| CSFB 2005-10 |
| CSFB 2005-11 |
| CSFB 2005-12 |
| CSFB 2005-2 |
| CSFB 2005-3 |
| CSFB 2005-4 |
| CSFB 2005-5 |
| CSFB 2005-6 |
| CSFB 2005-7 |
| CSFB 2005-8 |
| CSFB 2005-9 |
| CSFB HEMT 2005-AGE1 |
| CSFB HEMT 2005-FIX1 |

| |
|---|
| CSMC 2006-1 |
| CSMC 2006-2 |
| CSMC 2006-3 |
| CSMC 2006-4 |
| CSMC 2006-5 |
| CSMC 2006-6 |
| CSMC 2006-7 |
| CSMC 2006-8 |
| CSMC 2006-9 |
| CSMC 2007-1 |
| CSMC 2007-2 |
| CSMC 2007-3 |
| CSMC 2007-4 |
| CSMC 2007-5 |
| CSMC 2007-6 |
| CSMC 2007-7 |
| CSMC 2007-NC1 |
| CSMC 2007-R |
| CSSLT 2006-1 |
| PHH 2008-CIM2 |
| TBW 2006-1 |
| TBW 2006-2 |
| TBW 2006-4 |
| TBW 2007-2 |

| |
|---|
| HEAT 2003-1 |
| HEAT 2003-2 |
| HEAT 2003-3 |
| HEAT 2003-4 |
| HEAT 2003-5 |
| HEAT 2003-6 |
| HEAT 2003-7 |
| HEAT 2003-8 |
| HEAT 2004-1 |
| HEAT 2004-2 |
| HEAT 2004-3 |
| HEAT 2004-4 |
| HEAT 2004-5 |
| HEAT 2004-6 |
| HEAT 2004-7 |
| HEAT 2004-8 |
| HEAT 2005-1 |
| HEAT 2005-2 |
| HEAT 2005-3 |
| HEAT 2005-4 |
| HEAT 2005-5 |
| HEAT 2005-6 |
| HEAT 2005-7 |
| HEAT 2005-8 |
| HEAT 2005-9 |
| HEAT 2006-1 |
| HEAT 2006-2 |
| HEAT 2006-3 |
| HEAT 2006-4 |
| HEAT 2006-5 |
| HEAT 2006-6 |
| HEAT 2006-7 |
| HEAT 2006-8 |
| HEAT 2007-1 |
| HEAT 2007-2 |
| HEAT 2007-3 |
| HEMT 2003-1 |
| HEMT 2003-2 |
| HEMT 2003-3 |
| HEMT 2003-4 |

| |
|---|
| HEMT 2003-5 |
| HEMT 2003-6 |
| HEMT 2004-1 |
| HEMT 2004-2 |
| HEMT 2004-3 |
| HEMT 2004-4 |
| HEMT 2004-5 |
| HEMT 2004-6 |
| HEMT 2005-1 |
| HEMT 2005-2 |
| HEMT 2005-3 |
| HEMT 2005-4 |
| HEMT 2005-5 |
| HEMT 2005-HF1 |
| HEMT 2006-1 |
| HEMT 2006-2 |
| HEMT 2006-3 |
| HEMT 2006-4 |
| HEMT 2006-5 |
| HEMT 2006-6 |
| HEMT 2007-1 |
| HEMT 2007-2 |

| |
|---|
| ABSHE 2003-HE1 |
| ABSHE 2003-HE2 |
| ABSHE 2003-HE3 |
| ABSHE 2003-HE4 |
| ABSHE 2003-HE5 |
| ABSHE 2003-HE6 |
| ABSHE 2003-HE7 |
| ABSHE 2004-HE1 |
| ABSHE 2004-HE2 |
| ABSHE 2004-HE3 |
| ABSHE 2004-HE4 |
| ABSHE 2004-HE5 |
| ABSHE 2004-HE6 |
| ABSHE 2004-HE7 |
| ABSHE 2004-HE8 |
| ABSHE 2004-HE9 |

| |
|---|
| ABSHE 2004-HE10 |
| ABSHE 2005-HE1 |
| ABSHE 2005-HE2 |
| ABSHE 2005-HE3 |
| ABSHE 2005-HE4 |
| ABSHE 2005-HE5 |
| ABSHE 2005-HE6 |
| ABSHE 2005-HE7 |
| ABSHE 2005-HE8 |
| ABSHE 2006-HE1 |
| ABSHE 2006-HE2 |
| ABSHE 2006-HE3 |
| ABSHE 2006-HE4 |
| ABSHE 2006-HE5 |
| ABSHE 2006-HE6 |
| ABSHE 2006-HE7 |
| ABSHE 2007-HE1 |
| ABSHE 2007-HE2 |

**<u>Annex B</u>**

<u>CDOs</u>

McKinley Funding III
Millerton II High Grade ABS CDO
Bluegrass ABS CDO III
Neptune CDO II Ltd
Neptune CDO IV Ltd

## Annex C

Failed Credit Unions

2014

Life Line Credit Union Inc.
Health One Credit Union
Mayfair Federal Credit Union
Parsons Pittsburg Credit Union
St. Francis Campus Credit Union

2013

Bagumbayan Credit Union
Polish Combatants Credit Union
Mayfair Federal Credit Union,
Craftsman Credit Union,
Greater Oregon Federal Credit Union
Taupa Lithuanian Credit Union
PEF Federal Credit Union
Zane Trace Federal Credit Union,
Ochsner Clinic Federal Credit Union
First Kingdom Community Credit Union
Electrical Workers #527 Federal Credit Union
Lynrocten Federal Credit Union
Shiloh of Alexandria Federal Credit Union
I.C.E. Credit Union
Pepsi Cola Federal Credit Union
Amez United Credit Union
NCP Community Development Federal Credit Union
New Covenant Missionary Baptist Church Credit Union

2012

Border Lodge Credit Union
G.I.C. Federal Credit Union
Olean Federal Credit Union
Chetco Federal Credit Union
Women's Southwest Federal Credit Union
El Paso Federal Credit Union
United Catholic Credit Union
Eastern New York Federal Credit Union
People for People Community Development Credit Union
Saguache County Credit Union

Shepherd's Federal Credit Union
Wausau Postal Employees Credit Union
Telesis Community Credit Union
A M Community Credit Union

2011

Oakland Municipal Credit Union
Family First Federal Credit Union
NYC OTB Federal Credit Union
Wisconsin Heights Credit Union
Land of Enchantment Federal Credit Union
Mission San Francisco Federal Credit Union
Utah Central Federal Credit Union
Hmong American Federal Credit Union
Valued Members Federal Credit Union
St. James A.M.E. Federal Credit Union
Borinquen Federal Credit Union
Vensure Federal Credit Union

2010

Kern Central Credit Union  California
Friendship Community Federal Credit Union  Mississippi
Mutual Diversified Employees Federal Credit Union  California
Lawrence County School Employees Federal Credit Union  PA
South End Mutual Benefit Association, Inc.  Connecticut
Tracy Federal Credit Union  California
St. Paul's Croatian Federal Credit Union Ohio
Convent Federal Credit Union  New York
Orange County Employees Credit Union  Texas
Southwest Community Federal Credit Union  Utah
Norbel Credit Union  Utah
Certified Federal Credit Union  California
Kappa Alpha Psi  Texas
First American Credit Union  Wisconsin
Industries Puerto Rico Federal Credit Union  Puerto Rico
Phil-Pet Federal Credit Union  Texas
The Union Credit Union  Washington
Constitution Corporate Federal Credit Union  Connecticut
Beehive Credit Union

2009

Heritage West Federal Credit Union
Fairfield County Ohio Federal Employees Credit Union
Ensign Federal Credit Union

Second Baptist Church Credit Union
West Texas Credit Union
Members Own Credit Union
Clearstar Federal Credit Union
Comunidades Federal Credit Union
Kaiser Lakeside Credit Union
Free Choice Federal Credit Union
Community One Credit Union
Watts United Credit Union
High Desert FCU
Rouge Employees Credit Union
Center Valley Federal Credit Union

2008

West Hartford CU
N&W Poca Division FCU
Texdot WF Credit Union
Kaiperm FCU
Interfaith FCU
Port Trust FCU
New London Security FCU
Meriden F.A. FCU
Cal State 9 Credit Union
Sterlent Credit Union
Father Burk FCU
St. Luke Babtist FCU
Norlarco Credit Union
Valley Credit Union
High Desert FCU

2007

Homeowners Association Credit Union
Huron River Area CU
Green Tree CU
New Horizons Community Credit Union:
Cambria CU
Sharebuilders CU
State & Parish Employees FCU

2006

Marian Miami FCU
Mt. Hebron Babtist FCU
La Casa Federal Credit Union

Dedicators Federal Credit Union
I.L.A. 24 CU
Orleans Public Schools FCU
Punjab and Sindh FCU
Yankton Employee CU
Potter's House CU
St. Charles Borromea Church CU
St. John Babtist CU
Greater Harrisburg Community CU

2005

Good Samaritan Employees CU
Lorain Sacred Heard CU
Korean-American Chamber of Commerce CU
Jilapuhn Employees FCU
Homesteaders CU
Lock Haven Area FCU
Jamaica Postal Credit Union
Miss-Lou Federal Credit Union
Randolph Country FCU
Ko-Am FCU

**Annex D**

Failed Banks

Slavie Federal Savings Bank

Columbia Savings Bank

AztecAmerica Bank

Allendale County Bank

Vantage Point Bank

Millennium Bank, National Association

Syringa Bank

The Bank of Union

DuPage National Bank

Texas Community Bank, National Association

Bank of Jackson County

First National Bank also operating as The National Bank of El Paso

The Community's Bank

Sunrise Bank of Arizona

Community South Bank

Bank of Wausau

First Community Bank of Southwest Florida (also operating as Community Bank of Cape Coral)

Mountain National Bank

1st Commerce Bank

Banks of Wisconsin d/b/a Bank of Kenosha

Central Arizona Bank

Sunrise Bank

Pisgah Community Bank

Douglas County Bank

Parkway Bank

Chipola Community Bank

Heritage Bank of North Florida

First Federal Bank

Gold Canyon Bank

Frontier Bank

Covenant Bank

1st Regents Bank

Westside Community Bank

Community Bank of the Ozarks

Hometown Community Bank

Citizens First National Bank

Heritage Bank of Florida

NOVA Bank

Excel Bank

First East Side Savings Bank

GulfSouth Private Bank

First United Bank

Truman Bank

First Commercial Bank

Waukegan Savings Bank

Jasper Banking Company

Second Federal Savings and Loan Association of Chicago

Heartland Bank

First Cherokee State Bank

Georgia Trust Bank

The Royal Palm Bank of Florida

Glasgow Savings Bank

Montgomery Bank & Trust

86

The Farmers Bank of Lynchburg

Security Exchange Bank

Putnam State Bank

Waccamaw Bank

Farmers' and Traders' State Bank

Carolina Federal Savings Bank

First Capital Bank

Alabama Trust Bank, National Association

Security Bank, National Association

Palm Desert National Bank

Plantation Federal Bank

Inter Savings Bank, fsb D/B/A InterBank, fsb

HarVest Bank of Maryland

Bank of the Eastern Shore

Fort Lee Federal Savings Bank, FSB

Fidelity Bank

Premier Bank

Covenant Bank & Trust

New City Bank

Global Commerce Bank

Home Savings of America

Central Bank of Georgia

SCB Bank

Charter National Bank and Trust

BankEast

Patriot Bank Minnesota

Tennessee Commerce Bank

First Guaranty Bank and Trust Company of Jacksonville

American Eagle Savings Bank

The First State Bank

Central Florida State Bank

Western National Bank

Premier Community Bank of the Emerald Coast

Central Progressive Bank

Polk County Bank

Community Bank of Rockmart

SunFirst Bank

Mid City Bank, Inc.

All American Bank

Community Banks of Colorado

Community Capital Bank

Decatur First Bank

Old Harbor Bank

Country Bank

First State Bank

Blue Ridge Savings Bank, Inc.

Piedmont Community Bank

Sun Security Bank

The RiverBank

First International Bank

Citizens Bank of Northern California

Bank of the Commonwealth

The First National Bank of Florida

CreekSide Bank

Patriot Bank of Georgia

First Choice Bank

First Southern National Bank

Lydian Private Bank

Public Savings Bank

The First National Bank of Olathe

Bank of Whitman

Bank of Shorewood

Integra Bank National Association

BankMeridian, N.A.

Virginia Business Bank

Bank of Choice

LandMark Bank of Florida

Southshore Community Bank

Summit Bank

First Peoples Bank

High Trust Bank

One Georgia Bank

Signature Bank

Colorado Capital Bank

First Chicago Bank & Trust

Mountain Heritage Bank

First Commercial Bank of Tampa Bay

McIntosh State Bank

Atlantic Bank and Trust

First Heritage Bank

Summit Bank

First Georgia Banking Company

Atlantic Southern Bank

Coastal Bank

Community Central Bank

The Park Avenue Bank

First Choice Community Bank

Cortez Community Bank

First National Bank of Central Florida

Heritage Banking Group

Rosemount National Bank

Superior Bank

Nexity Bank

New Horizons Bank

Bartow County Bank

Nevada Commerce Bank

Western Springs National Bank and Trust

The Bank of Commerce

Legacy Bank

First National Bank of Davis

Valley Community Bank

San Luis Trust Bank, FSB

Charter Oak Bank

Citizens Bank of Effingham

Habersham Bank

Canyon National Bank

Badger State Bank

Peoples State Bank

Sunshine State Community Bank

Community First Bank Chicago

North Georgia Bank

American Trust Bank

First Community Bank

FirsTier Bank

Evergreen State Bank

The First State Bank

United Western Bank

The Bank of Asheville

CommunitySouth Bank & Trust

Enterprise Banking Company

Oglethorpe Bank

Legacy Bank

First Commercial Bank of Florida

Community National Bank

First Southern Bank

United Americas Bank, N.A.

Appalachian Community Bank, FSB

Chestatee State Bank

The Bank of Miami,N.A.

Earthstar Bank

Paramount Bank

First Banking Center

Allegiance Bank of North America

Gulf State Community Bank

Copper Star Bank

Darby Bank & Trust Co.

Tifton Banking Company

First Vietnamese American Bank

Pierce Commercial Bank

Western Commercial Bank

K Bank

First Arizona Savings, A FSB

Hillcrest Bank

First Suburban National Bank

The First National Bank of Barnesville

The Gordon Bank

Progress Bank of Florida

First Bank of Jacksonville

Premier Bank

WestBridge Bank and Trust Company

Security Savings Bank, F.S.B.

Shoreline Bank

Wakulla Bank

North County Bank

Haven Trust Bank Florida

Maritime Savings Bank

Bramble Savings Bank

The Peoples Bank

First Commerce Community Bank

Bank of Ellijay

ISN Bank

Horizon Bank

Sonoma Valley Bank

Los Padres Bank

Butte Community Bank

Pacific State Bank

ShoreBank

Imperial Savings and Loan Association

Independent National Bank

Community National Bank at Bartow

Palos Bank and Trust Company

Ravenswood Bank

LibertyBank

The Cowlitz Bank

Coastal Community Bank

Bayside Savings Bank

Northwest Bank & Trust

Home Valley Bank

SouthwestUSA Bank

Community Security Bank

Thunder Bank

Williamsburg First National Bank

Crescent Bank and Trust Company

Sterling Bank

Mainstreet Savings Bank, FSB

Olde Cypress Community Bank

Turnberry Bank

Metro Bank of Dade County

First National Bank of the South

Woodlands Bank

Home National Bank

USA Bank

Ideal Federal Savings Bank

Bay National Bank

High Desert State Bank

First National Bank

Peninsula Bank

Nevada Security Bank

Washington First International Bank

TierOne Bank

Arcola Homestead Savings Bank

First National Bank

Sun West Bank

Granite Community Bank, NA

Bank of Florida - Tampa

Bank of Florida - Southwest

Bank of Florida - Southeast

Pinehurst Bank

Midwest Bank and Trust Company

Southwest Community Bank

New Liberty Bank

Satilla Community Bank

1st Pacific Bank of California

Towne Bank of Arizona

Access Bank

The Bank of Bonifay

Frontier Bank

BC National Banks

Champion Bank

CF Bancorp

Westernbank Puerto Rico

R-G Premier Bank of Puerto Rico

Eurobank

Wheatland Bank

Peotone Bank and Trust Company

Lincoln Park Savings Bank

New Century Bank

Citizens Bank and Trust Company of Chicago

Broadway Bank

Amcore Bank, National Association

City Bank

Tamalpais Bank

Innovative Bank

Butler Bank

Riverside National Bank of Florida

AmericanFirst Bank

First Federal Bank of North Florida

Lakeside Community Bank

Beach First National Bank

Desert Hills Bank

Unity National Bank

Key West Bank

McIntosh Commercial Bank

State Bank of Aurora

First Lowndes Bank

Bank of Hiawassee

Appalachian Community Bank

Advanta Bank Corp.

Century Security Bank

American National Bank

Statewide Bank

Old Southern Bank

The Park Avenue Bank

LibertyPointe Bank

Centennial Bank

Waterfield Bank

Bank of Illinois

Sun American Bank

Rainier Pacific Bank

Carson River Community Bank

La Jolla Bank, FSB

George Washington Savings Bank

The La Coste National Bank

Marco Community Bank

1st American State Bank of Minnesota

American Marine Bank

First Regional Bank

Community Bank and Trust

Marshall Bank, N.A.

Florida Community Bank

First National Bank of Georgia

Columbia River Bank

Evergreen Bank

Charter Bank

Bank of Leeton

Premier American Bank

Barnes Banking Company

St. Stephen State Bank

Town Community Bank & Trust

Horizon Bank

First Federal Bank of California, F.S.B.

Imperial Capital Bank

Independent Bankers' Bank

New South Federal Savings Bank

Citizens State Bank

Peoples First Community Bank

RockBridge Commercial Bank

SolutionsBank

Valley Capital Bank, N.A.

Republic Federal Bank, N.A.

Greater Atlantic Bank

Benchmark Bank

AmTrust Bank

The Tattnall Bank

First Security National Bank

The Buckhead Community Bank

Commerce Bank of Southwest Florida

Pacific Coast National Bank

Orion Bank

Century Bank, F.S.B.

United Commercial Bank

Gateway Bank of St. Louis

Prosperan Bank

Home Federal Savings Bank

United Security Bank

North Houston Bank

Madisonville State Bank

Citizens National Bank

Park National Bank

Pacific National Bank

California National Bank

San Diego National Bank

Community Bank of Lemont

Bank USA, N.A.

First DuPage Bank

Riverview Community Bank

Bank of Elmwood

Flagship National Bank

Hillcrest Bank Florida

American United Bank

Partners Bank

San Joaquin Bank

Southern Colorado National Bank

Jennings State Bank

Warren Bank

Georgian Bank

Irwin Union Bank, F.S.B.

Irwin Union Bank and Trust Company

Venture Bank

Brickwell Community Bank

Corus Bank, N.A.

First State Bank

Platinum Community Bank

Vantus Bank

InBank

First Bank of Kansas City

Affinity Bank

Mainstreet Bank

Bradford Bank

Guaranty Bank

CapitalSouth Bank

First Coweta Bank

ebank

Community Bank of Nevada

Community Bank of Arizona

Union Bank, National Association

Colonial Bank

Dwelling House Savings and Loan Association

Community First Bank

Community National Bank of Sarasota County

First State Bank

Mutual Bank

First BankAmericano

Peoples Community Bank

Integrity Bank

First State Bank of Altus

Security Bank of Jones County

Security Bank of Houston County

Security Bank of Bibb County

Security Bank of North Metro

Security Bank of North Fulton

Security Bank of Gwinnett County

Waterford Village Bank

Temecula Valley Bank

Vineyard Bank

BankFirst

First Piedmont Bank

Bank of Wyoming

Founders Bank

Millennium State Bank of Texas

First National Bank of Danville

Elizabeth State Bank

Rock River Bank

First State Bank of Winchester

John Warner Bank

Mirae Bank

MetroPacific Bank

Horizon Bank

Neighborhood Community Bank

Community Bank of West Georgia

First National Bank of Anthony

Cooperative Bank

Southern Community Bank

Bank of Lincolnwood

Citizens National Bank

Strategic Capital Bank

BankUnited, FSB

Westsound Bank

America West Bank

Citizens Community Bank

Silverton Bank, NA

First Bank of Idaho

First Bank of Beverly Hills

Michigan Heritage Bank

American Southern Bank

Great Basin Bank of Nevada

American Sterling Bank

New Frontier Bank

Cape Fear Bank

Omni National Bank

TeamBank, NA

Colorado National Bank

FirstCity Bank

Freedom Bank of Georgia

Security Savings Bank

Heritage Community Bank

Silver Falls Bank

Pinnacle Bank of Oregon

Corn Belt Bank & Trust Co.

Riverside Bank of the Gulf Coast

Sherman County Bank

County Bank

Alliance Bank

FirstBank Financial Services

Ocala National Bank

Suburban FSB

MagnetBank

1st Centennial Bank

Bank of Clark County

National Bank of Commerce

Sanderson State Bank

Haven Trust Bank

First Georgia Community Bank

PFF Bank & Trust

Downey Savings & Loan

Community Bank

Security Pacific Bank

Franklin Bank, SSB

Freedom Bank

Alpha Bank & Trust

Meridian Bank

Main Street Bank

Washington Mutual Bank (Including its subsidiary Washington Mutual Bank FSB)

Ameribank

Silver State Bank

Integrity Bank

Columbian Bank & Trust

First Priority Bank

First Heritage Bank, NA

First National Bank of Nevada

IndyMac Bank

First Integrity Bank, NA

ANB Financial, NA

Hume Bank

Douglass National Bank

Miami Valley Bank

NetBank

Metropolitan Savings Bank

Bank of Ephraim

Reliance Bank

Guaranty National Bank of Tallahassee

Dollar Savings Bank